## No. 11,402.

### PEOPLE EX REL. GRAHAM, ET AL. *v.* LINDSEY.

Decided January 24, 1927.   Rehearing denied February 21, 1927.

Action in quo warranto to try title to the office of juvenile judge.   Judgment for respondent.

### *Reversed.*

1. ELECTIONS—*Irregularities—Fraud.*   Where there is a gross disregard of the procedure and formalities required by statute in the conduct of elections, whether permitted by design or through ignorance or negligence, the returns should be rejected, and it is not necessary that actual fraud should be committed.

2. WITNESSES—*Failure to Testify.*   Where witnesses who were in full possession of the facts concerning a transaction under judicial investigation did not testify, it is held that their silence might well be treated as a further corroboration of testimony already given.

3. APPEAL AND ERROR—*No Assignment.* On review, where plaintiff in error has no cause to complain of a ruling of the trial court and defendant in error assigned no cross error thereon, the question will not be considered.

4. ELECTIONS—*Recount—Fraud.* In an action in quo warranto involving the election of a public official, a recount of the vote on the trial could not purge fraud occurring at the election which was shown by the evidence to have been committed.

5. PARTIES—*Substitution.* In an action to try title to public office, where one relator has withdrawn and the only remaining relator dies pending a review in the Supreme Court, and a motion to substitute the widow of the deceased relator is presented, held, in the circumstances appearing in the record upon the motion, that the widow may be substituted.

6. ELECTIONS—*Fraud.* Where fraud occurs in an election and it is impossible to separate with reasonable certainty legal from illegal votes, the entire vote should be rejected.

*On Rehearing.*

7. TRIAL—*Motion for Judgment—Effect.* In an action in quo warranto, relator having rested, respondent moved for judgment which was granted. Under the facts disclosed it is held that he thereby submitted his case upon the evidence then before the court.

8. QUO WARRANTO—*Public Office—Burden of Proof.* In an action in quo warranto to try title to public office, the burden of proof is upon the respondent in the trial court, and not upon the relator. No distinction as to this rule can be made between a case where the district attorney institutes the proceeding upon his own information in the name of the people, and where the proceeding is instituted upon the complaint of a private party in the name of the people by permission of the court where the district attorney neglects or refuses to act.

9. *Public Office—Proof.* In an action in quo warranto to try title to public office, respondent having offered no proof to show his title and right to the office, no judgment other than ouster could properly be rendered.

10. TRIAL—*Elections—Review.* Where, in an action in quo warranto, involving a public election, respondent consented to and participated in a recount of the ballots, and conceded that the result in one precinct only was in controversy, he was in no position to ask that the case be sent back to enable him to prove irregularities in other precincts.

11. APPEAL AND ERROR—*No Exceptions—Waiver.* A party waives his right to be heard upon rulings to which he saves no exception.

12. OFFICES AND OFFICERS—*Property Right in Office.* There is no property in a statutory public office and no contractual relation between the state and the incumbent of an office.

*Error to the District Court of the City and County of Denver, Hon. Julian H. Moore, Judge.*

Mr. FRANK L. HAYS, Mr. E. M. SABIN, for plaintiffs in error.

Mr. HORACE N. HAWKINS, Mr. THOMAS WARD, JR., Mr. JAMES A. MARSH, Mr. CHARLES GINSBERG, Mr. PHILIP HORNBEIN, for defendant in error.

*En banc.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

THIS is an action in quo warranto brought by the people of the state of Colorado upon the relation of Royal R. Graham, et al., against Ben B. Lindsey, asking the court to require defendant to show cause why he is entitled to hold the office of juvenile judge in the City and County of Denver, why he should not be ousted therefrom, and why the relator Graham should not be admitted into the same, and also for other appropriate relief.

The trial court at the conclusion of the relators' case found the issues in favor of respondent, and relators bring the case here for review.

After the case was brought to this court Graham died, and Mrs. Graham, his widow, was substituted as the relator, Charles L. Laney, the other relator, having withdrawn.

At the November, 1924 election, the relator Graham and the respondent Lindsey were rival candidates for the

office of juvenile judge of the City and County of Denver, Graham being the Republican candidate and Lindsey being the Democratic candidate.

The election returns showed respondent to have been elected by a majority of 137 votes, and he was issued a certificate of election. At the trial in the district court all the ballot boxes of all the precincts of the City and County of Denver were opened and a recount of the ballots had, upon which the court found that respondent had been elected by a majority of 35 votes, and rendered judgment accordingly.

Errors and mistakes on the part of the judges and clerks of the election in receiving and counting the ballots in precinct 6, district J, and also fraud on the part of election officials and others in that precinct are charged.

It was also claimed that certain ballots were not marked in the space or square placed on the ballot for that purpose opposite the name of the candidate, but were marked above and below the line, and were improperly counted.

Four witnesses were called to testify on behalf of the relators concerning the charges of fraud and misconduct of election officials and others in precinct 6, district J, and their testimony we shall here briefly summarize.

Thomas L. Otter testified: Saw William Unter there standing at the door of the voting place; saw him on the front porch, inside, outside, and all over, marking ballots on the front porch, back in the judges' room, and helping in counts; that he seemed to do everything that was to be done; that he didn't seem to care what he did; that he did as he pleased; saw him mark one ballot outside the voting place; saw him go into the voting booth several times with voters; that Unter said he did it because the people didn't understand how to vote; saw Unter go into the booths and mark ballots three or four times; did not see any judge swear Unter; saw the election judges go into the booths with voters; there was disturbance there all day long in the election booths and in all three rooms.

He further said, ''There was so much trouble, my God, I couldn't begin to tell it''; that every time the witness went into the kitchen Unter would go in the other room; that witness would follow him up and he would come back again; that things run along those lines back and forth, with the witness following him and he following the witness all day long; that Mr. Mowry came in all hostile; that the counting judges thought there was going to be trouble, and possibly a riot, and they said, ''Let him count them.'' Witness told Mowry that he would have to go out; that there was so much disturbance that witness tried to get them to stop the counting; that there were close to ten or fifteen people in the kitchen with the counting judges while they were counting; that about eight o'clock that night some fellows whom the witness did not know took half the ballots in another room from the counting room and counted them themselves; that they took them from the counting clerks; thought possibly they took a hundred or more ballots; that they took a big stack and split them; that four or five other people went with them; that they went in the other room and closed the door; that witness went to try to get the election commission to send somebody up there because things were not right; that he couldn't get them and decided to let it go; that he knew that the ballots these men took into the other room had not been counted by the counting clerks; that at times he was in that room himself, and that the people in there were just counting the ballots; that these men reported back to the counting judges how many of the votes Lindsey got and how many Graham got, and the counting clerks took their report; that there were ballots all over the house; that he did not know what became of them; that Unter was the only one among these men whom he knew; that he saw others besides Unter and the judges of election who entered the polling places with voters, possibly three times; said he was in the room where the ballots were taken before they were counted; that everybody was trying to count them at once; that he

took particular notice of what happened; that witness was threatened by Mowry and four or five others. When asked how it happened that the women counted he answered, "They thought there was going to be a riot." He said the women were absolutely afraid of the men.

McCullough testified that he was there on election day as Republican executive committeeman; that voters would go into the booth and three or four people go with them who were neither election judges or officials; that he saw about 152 ballots taken into a side room after the election was over, and saw six men in there with the ballots; that among the six were Unter, Silverberg and Weitz; that they had no poll books or tags, or anything to show that they were counting the ballots; that they had these ballots scattered over the table, and when witness went in Unter told him they were helping with the counting; that witness complained that he was not getting a square count; that a blond lady came up to him and said, "I will tell you what we will do, we will just give you 50 votes"; that witness said, "Just what do you mean, 50 votes?" That she replied, "Why, 23 will give you 50 votes for your candidate"; that witness said, " I have no candidate, I am merely here to check up and see that the ballots are actually counted as they were cast"; that she replied, "Well, we are tired and we don't want to go through all this stuff again, and we will just give you fifty votes—we will give you 50 for Morley, and will take 50 off from Sweet and give them to Morley"; that witness then said to her, "No, I don't want votes for anyone; all I want is the vote as actually cast"; that they had all the ballots in the box except 152 that were in the other room, and that the blond lady said to him, "Well, now, we don't want to go all through this, and we will just give you 50 votes"; that the blond lady went away and presently came back and again said, "Now, listen, if we will give you 50 votes you should be satisfied. We don't want to do this over"; that Unter spoke up and said to the blond lady, "You don't know who you are

talking to, you had better go out in the other room''; that the blond lady was Unter's sister; ''I demanded a recount of the entire ballot, which they refused, but they did go back to the back room to the counting judges. They had the tally sheets and the reports all made up; they took 16 votes off Mr. Sweet's count at that time, and absolutely refused to make any further recount on it''; that the counting judges took the report made by the gentlemen and ladies and went back there and told them what the count was, and the counting judges changed their tally sheet to make it conform to the recount as brought back to them. He saw them tallied on the report as given by Mr. Unter and others. Unter had physical possession of the ballots in the front room where the six people were; that Unter and others put the count down on pieces of scrap paper and reported it to the tally clerks, and they entered it on the books as the amounts by Unter and others; that the count on 152 ballots was correct, so far as Juvenile Judge was concerned; that the only mistake he knew anything about was 16 votes which Sweet got which he was not entitled to.

George Carroll testified that he was at the polling place at 9:30 in the evening; that in the front room there were two women and four men; two of them were Silverberg and Weitz; that he did not know the others; that when he went into the room the parties present gathered the ballots and one man went out in the back room, came back with a piece of cardboard and started counting them, giving them off and tallying down on a piece of cardboard. Witness testified to the conversation between McCullough and the blond lady over the vote for Governor; said that Unter told the woman to shut up, that she didn't know what she was talking about; that the woman offered to give 50 votes to the side that she thought McCullough was on; that witness went in the back room with McCullough; that Unter brought in a cardboard and announced the votes, and the clerks recorded them; that he didn't see the tally clerks examine any of the

votes; that the ballots were left in the other room; that the lady said there were 152 ballots in the other room.

William Unter testified that he was a watcher for the Democratic party, taking charge of the workers, and seeing that everything passed all right; that the counting judges consisted of his sister, Mrs. Singer, Mrs. Reckler, and Mrs. Rolnick; that the receiving judges were Mrs. Steinberg, Miss Goodman, and Mrs. Sapperstein; that he knew Silverberg and Weitz, Silverberg being there for the Democrats and Weitz for the Republicans; that Silverberg and Weitz entered into a deal and agreement with his sister, Mrs. Singer, and that he knew all about it himself; that under the agreement the only thing Republicans wanted was the state senators, and the balance of the ticket was for the Democrats to do with in whatever way the witness wanted; that the deal was entered into five or six days before election; that during election day he was inside in the counting room, was outside, and in the receiving room for a while, and in and out all day; that he was in the voting booths; that while the voters were voting he went in the voting booths fifty or sixty times probably, or more; that he went in there at times to show people the way to vote his ticket; ''Most of the time I went in there myself to mark up the ballots for the voters,'' and that he would mark them, sometimes at the request of the voters and other times on his own motion; that he was not sworn; sometimes the voters asked for assistance and sometimes they did not, most of the time they didn't ask for it; that he couldn't say exactly how many ballots he marked in the booths, but guessed around about fifty; that he marked the ballots for the Democratic ticket all the way up and down, including Judge Lindsey; that the voters didn't ask him how to mark the ballots; that he went in there himself and actually marked them; that he was never sworn to render assistance for the people whom he assisted; that he did those things off and on all day; that there were others in there who were not judges or clerks doing the

same thing; that Silverberg was one who was in there doing the same thing; that a couple of times he walked in the ballot booths when Silverberg was in there marking up ballots; that when his sister was out for a while he went in to take charge of the ballots, and to count them; that Silverberg was not sworn to render assistance; that there were none of the judges or counting clerks with Silverberg in the booths; that he saw him in there twice; counting judges in the kitchen, the receiving judges in the front room; that after he marked the ballots in the booths he gave them to the voters, and they passed them up to the receiving judges; that the Democratic judges were appointed about a week before the election, and that the Republican judges were changed a few days before the election at the request of Silverberg; that Mrs. Reckler and Mrs. Rolnick were put there at Silverberg's request; that witness went a few times to empty the ballot box and took the ballots to the counting room; that Unter and others opened the box and took out the ballots; that at night he took a little part in counting the ballots; that the last batch of ballots, 157, were taken into the front room by some persons, and they were in there counting them, and then he went away and left the ballots in there. "I was in there with Silverberg alone with these ballots starting over myself to count them. Must have been there about an hour." That an argument started in the back room and Silverberg went back and left him alone; that they were in there at the time just counting them up; that they were keeping tally on a piece of scrap paper; that the 157 ballots were left on the table in the front room after they got done with the count for juvenile judge and for the district attorney; "Silverberg and I went over the ballots ourselves in counting them, and counted them anyway we saw fit at the time;" that witness was alone with the ballots for about ten or fifteen minutes and said that he saw the way they were in the other room during all day, he saw them counting, count-

ing them up all around, and so he was marking the ballots to agree with the count; that he just marked in his ticket; that he did that as long as he was in there alone; thought he marked fifty or sixty for the Democratic ticket; did not mark any for Graham. "After we got through with the 157 ballots we took them in the kitchen or counting room where the counting clerks were. We just gave them a tally of our count. I just gave them the amount of votes for each person that we had on the piece of paper, on the scrap of paper." That on some of the officers they actually did make a count, "and the others we arrived at this count ourselves;" saw Silverberg, also the receiving judges, sometimes the other judges and the clerks, go in there to mark ballots; they marked them in the voting booths; they were not sworn; did not see any memorandum made on any tally list or ballots as to assistance rendered anybody; saw all the receiving judges marking ballots at different times; marked them the way he asked them to for the Democratic ticket; marked them in the booths; thought they marked as many as he did, about fifty or sixty. Said that he knew McCullough; "McCullough came in the room about 9:30 and noticed something wrong. He found that we did hand in just too many votes for Governor Sweet." Said that he had a faint recollection that an offer was made to give so many votes to Governor Morley if there would be no recount; that McCullough blamed him because he was in there alone with the ballots; that after they had reported to the judges and counting clerks on the 157 ballots they took them to the judges to be counted; that the counting judges did not recount the ballots, but took the report that the witness made; that he marked down on a scrap of paper the number of ballots that each candidate was to have credit for; said there were some they gave the actual count and some they did not bother at all with the counting; judges set down a figure; that that was not true as to Judge Lindsey's vote; that none of the voters who were assisted took any oaths before such assistance was ren-

dered, and none made the oath that they were physically unable to mark the ballot without assistance; witness said that he knew Francis of the juvenile court; that a week before election he met Francis on the street; that Francis asked him to take good care of Lindsey out there and that he would take good care of the witness; that he promised him $150; that he afterwards received $25, and no more; that Jack Martin paid witness' house rent, $65 a month, while witness was in jail, and furnished witness' family with groceries during that time; that Martin commenced paying his house rent about January 25th; that Martin gave him some money around about Christmas time, or in the beginning of December; that Martin gave him $100 while witness was at Stellor's house; that since that time and up to the time of trial Martin had been paying his house rent; witness said he understood why Martin was doing it; that it was because he was in jail, with no means to support his wife and babies, and that was his reason for doing it. When asked if he didn't know that the reason Martin gave him that $100 was because witness had made a statement to the chief of police, and because he expected him to favor him in this case against Judge Lindsey, the witness answered, "I guess that is the reason for it, yes, sir. * * * All the time Mr. Martin has asked me to tell the truth, and nothing but the truth." "I asked them for the money, and he paid for my family's support and rent." Witness said that Weitz and Silverberg wanted the Republican senators, and that he, witness, agreed to it; that they gave him no money for it; that his sister was doing almost everything he asked her to; that the deal was to be carried out mostly on the counting; that everybody was in on it; that his sister did the counting of the ballots herself. The witness further testified that Martin never offered him any inducement to tell the story that he did upon the witness stand; that the last time he talked to Martin was about the beginning of December; that Francis said he would take care of him; that Fran-

cis was going to see that he got a job in the juvenile court.

The votes returned from that precinct show as follows as to certain candidates:

### For Juvenile Judge

| | |
|---|---|
| Lindsey, Democratic | 548 |
| Graham, Republican | 15 |

### State Senator

| | |
|---|---|
| Bogdon, Republican | 141 |
| Downing, Democratic | 67 |
| Fairfield, Republican | 373 |
| Young, Republican | 490 |

### For United States Senator

| | |
|---|---|
| Adams, Democratic | 428 |
| Phipps | 98 |
| Sheafroth | 516 |
| Means | 25 |

### For Congressman

| | |
|---|---|
| Vaile | 359 |
| Edgeworth | 92 |

### For Supreme Court Judge

| | |
|---|---|
| Teller | 485 |
| Adams | 22 |

### Governor

| | |
|---|---|
| Sweet, Democratic | 529 |
| Morley, Republican | 14 |

Following the foregoing evidence the plaintiffs moved that the ballot boxes in precinct 6, district J, be opened, and thereupon the court said: "The evidence in this case discloses that there was fraud committed in this precinct; that has not been disputed up to this time. This court cannot determine the rights of the parties in this suit without determining the extent of that fraud, and its character. This cannot be done without opening the box."

No other testimony at any time during the trial was introduced. At one time defendant offered to produce and place upon the witness stand to testify Judge Lindsey and Mr. Francis, which offer the court refused because premature, as plaintiffs had not rested their case. No further offer of evidence on behalf of defendant was made.

In denying plaintiffs' motion to reject the entire vote cast in this precinct the court said among other things: "It has not been shown by a preponderance of the evidence in this case, to the satisfaction of the court, that the fraud, if any, committed in Precinct J-6 was of such gravity as to warrant the courts in throwing out the entire vote in that precinct. * * * There is no positive evidence to show that there was any fraud in the counting of these blank ballots. It may have been done by mistake; but even assuming that fraud was committed, this has been purged by the recount. Even assuming that there was evidence of fraud in reference to the recounting of the votes for senatorial candidates, that in itself ought not to be sufficient to require the court to set aside the entire precinct vote, for the reason that the candidates here mentioned are not benefited or harmed by such fraud. * * * Even assuming the entire truthfulness of the witness Unter, that everything he said was true, there would be no sufficient evidence upon which the court could set aside this entire precinct vote."

Defendant does not attack the credibility of the witnesses Otter, McCullough and Carroll, but does strenuously assail the credibility of the witness Unter.

This case is not one presenting the question of the court's findings upon conflicting evidence. Here there is no conflict in the evidence. It is a question merely of the weight and sufficiency of the evidence. The defendant charges that Unter was unworthy of belief; that he was a perjurer and that the trial court did not believe his testimony. In saying that the trial court disbelieved the testimony of Unter the defendant is in error. The trial court apparently did believe the testimony of Unter,

as shown by the fact that after all of the testimony was introduced, on the strength of that testimony the court found that fraud had been committed and ordered the ballot boxes opened.

The defendant must, in fact does, concede that if Unter was a reliable witness, and his testimony true, fraud was established, for counsel in their brief say: "We have said that there is no testimony, direct or circumstantial, showing fraud, outside that of the witness Unter, and we have said that the witness Unter was a suborned perjurer;" and again, "Without the testimony of Unter the case of the relators collapses." It is worthy of note that defendant also concedes that irregularities did occur in this precinct, for counsel say, "It may be that it is irregular for persons other than the sworn judges to count any part of the ballots, but the fact is that in the haste and excitement attendant upon getting the returns for anxious candidates, the assistance of bystanders is enlisted in the count. It may be that mistakes in the count occur as a result, but a recount such as was had in the court below remedies whatever mistakes may have occurred."

In addition to the charge made against Unter that his testimony was bought and paid for, it is charged that his statements upon the witness stand were inconsistent with themselves; that he related in his testimony the occurrence of things during election day and evening, in this precinct, that were improbable at least, in fact impossible of accomplishment, and that he was an election crook. They sought to show this by asking the question: "You had been a confirmed election crook, you mean, is that right?" The witness did not answer this question directly, but seems not to have denied that he had been. This is quite helpful, as it tends at least to show that the witness had the necessary experience and qualification for the task which he set about to perform at the election in this precinct.

Section 7691, C. L. 1921, provides that the counting judges and their clerks and the watchers must take an

oath that they will not in any manner make known to anyone the result of the votes as they are being counted until the polls are closed, and that all other persons shall be excluded from the place where such counting and canvassing is being carried on, until the close of the polls.

Section 7692, C. L. 1921, provides, inter alia, that whenever ballot boxes are moved from one room to another they shall be under the constant observation of at least one of the counting judges.

Section 7744, C. L. 1921, provides that any voter who declares under oath that by reason of physical disability he is unable to prepare his ballot without assistance shall, upon his request, receive the assistance of any two of the election judges or clerks who are of different political parties in the marking of the ballot, and that such officers shall certify on the outside thereof that it was so marked with their assistance; that the judges are qualified to administer such oath, and that a memorandum shall be made on the poll lists of every instance when an oath is administered to a voter, stating what facts were sworn to, the name of the affiant, and the names of the judges or clerks who aided the voter in the preparation of his ballot; that no voter shall ask for or receive the assistance of any person within the polling place in the preparation of his ballot, except as in the statute provided.

Section 7745, C. L. 1921, provides in substance that no election official or other person shall be allowed to enter any election booth for the purpose of assisting the voter in preparing his ballot, or for any other purpose while the booth is occupied by a voter, except in case of absolute and total physical disability on the part of the voter which makes it impossible for him to mark the ballot; that then and in that case the voter shall first state under oath his physical disability; that the oath shall be administered by an election judge; that the disability must be stated in writing and duly sworn to; that the voter shall then be accompanied into the booth by two judges or a judge and clerk, each of the opposite

political faith, who may mark his ballot as the voter shall indicate; that a notation shall be made in the poll books opposite the name of each voter thus assisted stating that he has been assisted; that the oath shall be obtained by the election officials and filed with their returns at the same time the election returns are made.

We have carefully read the record of the entire evidence as presented in the abstracts, and find that it reveals a most regrettable and astounding condition which prevailed during the election day and evening, a condition which must receive our most emphatic disapproval. The whole conduct of the judges and clerks of election in that precinct shows gross negligence, and a total disregard of their official duties. Doubtless they were intimidated and made afraid by the boisterous and riotous conduct of men who were permitted to gather in the rooms and voting booths, but this does not excuse them, nor did it relieve them of the duty to observe the law in the conduct of the election. If this testimony is to be believed, great disorder and confusion prevailed there on election day from eight o'clock in the morning until the last ballot was counted in the evening. The statutes were flagrantly violated and wholly disregarded; unauthorized persons were permitted to enter the voting booths with voters to assist them in marking their ballots when no assistance was asked for, and no oath of the voter that he needed or desired assistance; persons were permitted to enter the room of the counting judges and assist in the counting of the ballots during the prohibited hours from eight in the morning until the closing of the polls, and thereafter; information was given out by the counting judges, and information permitted to be obtained during the prohibited hours as to how the count stood; there was no pretense of excluding, during the hours mentioned, persons who had no right to be present, from the room where the counting and canvassing was being carried on; no memorandum was made on the poll lists of any instance when an oath was administered to a voter, if any oath was administered; no nota-

tion was made in the poll books opposite the name of any voter assisted, stating that he had been assisted; no such oath was obtained by the election officials and filed with their returns, although it appears that a considerable number of voters were assisted, and all without any observance of the formalities required by the statute. It further appears that the judges accepted as official the count made by unauthorized persons, and further, that one of the judges several times offered to take fifty votes off one candidate and give them to another. This offer, while very accommodating and generous, was wholly unwarranted, unlawful and fraudulent.

Whether these things were done and permitted by design, or through ignorance or negligence, was wholly immaterial, for the result is the same. If the sanctity of elections is to be recognized and preserved, if the secrecy and purity of the ballot are to be secured, and such is surely the design of our statutes, the courts must refuse to sanction such conduct as the evidence shows obtained in this precinct. However, it is not necessary that actual fraud be committed.

The language of Mr. Justice Bailey in *Vigil v. Garcia,* 36 Colo. 430, at page 438, 87 Pac. 543, 546, is very pertinent: "It is seriously contended that many of the irregularities in this precinct were the result of accident, or occasioned by mere oversight, and that there was no intention to commit fraud. It requires a great deal of credulity to maintain that an election board in a city of the size and intelligence of Trinidad could be so ignorant as not to know that the law was transgressed most flagrantly by every person employed in conducting this election."

And again at page 441 Justice Bailey said: "Here it is found by the trial court, that many persons who were assisted were not sworn as to their ability, and no record of assistance was kept. If this can be permitted, then the provisions of the law are without avail. It will be possible for any number of voters to market their votes and call in the judges to see that the goods are properly

delivered, wherefore this act, made for the preservation of pure elections, will become a machine in aid of corruption."

In that case the court further said: "But, it is said, that there was no fraud intended, and that there is nothing to show that contestor suffered on account of any of these things. This will not avail. The conduct of election officials may, though actual fraud be not apparent, amount to such culpable negligence as to render their doings unworthy of credence. If the misconduct has the effect of destroying the integrity of the returns and avoiding the prima facie character which they ought to bear, such returns should be rejected." Citing McCrary on Elections, §§ 488–540.

This court in that case cited with approval *Tebbe v. Smith,* 108 Cal. 101, 41 Pac. 454, 29 L. R. A. 673, a decision from the Supreme Court of California, in which it is said: "In this we are quite willing to believe that the misconduct of the officers of Lake precinct was prompted by nothing worse than ignorance, and lack of appreciation of the responsibility of their position, and we may say further, that no harm is shown to have resulted from this conduct; but looking to the purity of elections, and the integrity of the ballot box, we are constrained to hold that conduct like this amounts, in itself, to such a failure to observe the substantial requirements of the law as must invalidate the election."

This court also in that case cited with approval *Attorney General v. McQuade,* 94 Mich. 439, 53 N. W. 944, wherein it was held that the provisions of the election law requiring the voter to enter the booth alone, and prepare his ballot concealed from view, and the section providing for the marking of the ballots of illiterates, are mandatory and must be strictly adhered to. It would require long and diligent research to find a case so nearly decisive of the instant case as the decision of this court above cited. See also *Londoner v. People ex rel. Barton,* 15 Colo. 557, 564, 26 Pac. 135.

We also call attention to the fact that the judges and clerks of election in this precinct were not called upon to testify. They were in full possession of all the facts, and of all that occurred during election day and evening, and it is a proper subject of comment that they were not called to give their testimony. Their silence may well be treated as a further corroboration of the testimony given. *Fries v. People,* 80 Colo. 430, 252 Pac. 341.

In *United States v. Mammoth Oil Co.,* 14 Fed. (2d Series) 705, opinion by Kenyon, Circuit Judge, the court said: "This court has the same right to draw conclusions from the silence \* \* \* of witnesses as has the trial court," citing authorities. And the court further said: "The parties who could explain the same seem to be either conveniently absent \* \* \* or strangely and eloquently silent."

Judge Kenyon, in that case, quoted from *Gulf C. & S. F. Ry. Co. v. Ellis,* 54 Fed. 481, saying: "Now, it is a well-settled rule of evidence that, when the circumstances in proof tend to fix a liability, on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion."

Quoting from another case Judge Kenyon said: "As they had it in their power to explain the suspicious circumstances connected with the transaction, we regard their failure to do so as a proper subject of comment."

Another important and significant fact is that Unter was an unwilling witness. He had sought the advice of the district attorney as to whether he could be compelled to give testimony concerning his acts and doings in this precinct on election day. When called to the witness stand he refused to testify until, after strenuous insistence on the part of counsel for defendant, the court compelled him to do so.

We think we should also call attention to the fact that the testimony of Unter is corroborated in many particulars by the evidence of Otter, McCullough and Carroll, as an examination of their evidence will disclose. His testimony is further corroborated by the returns from that precinct showing the votes received by the several candidates as set forth herein. It is unnecessary for us to pass upon the question raised concerning the validity of the 102 ballots marked below the line. As we understand the record, the trial court refused to count these ballots for the defendant, and the plaintiffs therefore have no cause for complaint, and the defendant has not assigned cross errors thereon.

The trial court said that if any fraud was committed it was purged by the recount. This cannot be so. No attempt was made by the trial court to separate the legal from the illegal votes cast for the office of juvenile judge, and indeed, any attempt to do so would have been abortive in view of the evidence, and the recount could not purge the fraud which is shown by the evidence to have been committed.

As to the question raised concerning the substitution of Mrs. Graham as relator, we need only say that we are entirely satisfied with our action heretofore taken in that regard, and see no reason to change our former ruling allowing the substitution.

We think the trial court erred in overruling plaintiff's motion to reject the entire vote cast in precinct 6 in district J for the candidates for juvenile judge. We think it is impossible to separate with reasonable certainty the legal from the illegal votes for that office, and the vote from that precinct should be excluded. The motion should have been sustained.

The judgment is reversed, and the case remanded with instructions to the trial court to reject from the count the entire vote cast in precinct 6 in district J, and render judgment of ouster as prayed.

MR. JUSTICE BUTLER not participating.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE CAMPBELL dissent.

MR. CHIEF JUSTICE BURKE dissenting.

I was unable to agree with my associates on the order of substitution heretofore made herein. I am still of the same opinion, hence, on that branch of the case I dissent. In this dissent I am authorized to say that Mr. Justice Campbell concurs.

Disregarding entirely the testimony of the witness Unter, as I think the trial court ought to and did, the remaining evidence presents an undisputed condition of affairs in precinct 6, J, which destroys "the integrity of the returns" and avoids "the prima facie character which they ought to bear." Under such circumstances I see no escape from the holding in *Vigil v. Garcia,* quoted in the court's opinion herein, that "such returns should be rejected," "though actual fraud be not apparent," and though there is nothing to show that the complaining candidate "suffered on account of any of these things." Hence on that branch of the case I concur.

*On Rehearing.*

MR. JUSTICE SHEAFOR.

Respondent's chief reliance for a rehearing is based upon the proposition that this court erred in remanding the case to the trial court with instructions to enter judgment of ouster, and that by so doing we have denied respondent his day in court and deprived him of his property, without due process of law, in violation of the 14th Amendment to the federal Constitution.

Respondent states that we overlooked that portion of the original record where the trial court said no defense was necessary. This part of the record does not appear in either the printed abstract of the record nor in the

supplemental abstract filed by respondent. By rule 36 it is provided that if anything necessary to a determination of the case is omitted from the abstract it may be supplied in a supplemental abstract.

While we are not required to look beyond the printed abstracts, we did, however, consult the original record, and did not overlook the portion thereof to which our attention has been called. The record discloses that after all the testimony had been introduced, relators moved that the ballot boxes in precinct 6, district J, be opened, and objection being made the trial court said, "The evidence in this case discloses that there was fraud committed in this precinct. That has not been disputed up to this time * * *." The objection was overruled and the boxes in that precinct ordered opened, which was done, and the recount was made.

Thereupon the parties stipulated that either party might open any ballot box in any precinct in the City and County of Denver, and this was followed by the opening of all the remaining ballot boxes, 210 in number, and the ballots therein recounted. Later, and after some further proceedings, the relators moved to reject the returns, certified by the election commission, and the entire vote cast in precinct 6, district J, for the candidate for juvenile judge.

When the trial court observed that the evidence of fraud had not been disputed, the defendant made no suggestion at that time that he had, or would introduce, any evidence then or thereafter to contradict the evidence of fraud.

When the motion was presented, by relators, to reject the entire vote of this precinct, no objection, to the presentation of the motion at that time, was made by respondent, and no suggestion was then made by him that he had any evidence, or desired to introduce any, before the motion should be heard, or that if the motion should be sustained he would desire to introduce evidence to dispute the evidence of fraud.

The respondent could not know that the court would overrule the motion, and he might well have assumed, in view of the court's statement that fraud had been established, the motion would be sustained, especially so in view of this court's holding in *Vigil v. Garcia,* 36 Colo. 430, 87 Pac. 543. For the purpose of the hearing of the motion the respondent occupied the position of having rested his case on the evidence already submitted, and taking a chance on the ruling of the court. The ruling, however, was favorable to defendant and the motion of relators was denied.

Then counsel for respondent offered to place Judge Lindsey and Mr. Francis upon the witness stand to testify for the sole purpose of refuting the testimony of the witness Unter, as to any participation of Lindsey and Francis in the alleged fraud, and to vindicate the character of Judge Lindsey. This evidence was not again offered, nor was any other or further offer of evidence made at that or any other time, and no intimation made then that respondent at that or any other time had or would introduce evidence to contradict the evidence of fraud.

As pointed out in the original opinion, this offer of evidence was rejected because the court held that the offer was premature.

After some further proceedings the relator rested, and the court proceeded with its findings to the effect that respondent was elected by thirty-five votes in excess of the votes cast and counted for relator Graham. It was at this point the court remarked that no defense was necessary and respondent then moved for judgment, which was granted.

It is true we did assume, but not erroneously as respondent contends, that respondent had rested his case, and did not desire to introduce any further proof. After a careful reading of the record in this case we cannot escape the conclusion that respondent had no evidence which he wished to introduce upon the trial, other than

that already mentioned, and the recount of all the ballots hereinafter referred to, and that he submitted his case upon the evidence then before the court.

In *Schwanekamp v. Modern Woodmen of America,* 44 Mont. 526, 120 Pac. 806, the plaintiff sued upon a benefit certificate. The case was tried to the court without a jury, and at the close of plaintiff's case the defendant moved for judgment which was granted, judgment accordingly and plaintiff appealed.

The court said: "The motion interposed by the defendant amounted to a submission of the case upon the evidence introduced by the plaintiff, and it is of little consequence by what name it was designated, or whether any grounds were specified. The court properly treated it as a submission of the entire case for decision upon the evidence then before it."

It has at no time, either in the oral argument or in respondent's brief, been suggested that respondent had any evidence which he wished to introduce to dispute or contradict the evidence of fraud or misconduct, or that he had any witness which he wished to call upon the stand for that purpose.

It is not even intimated in the petition for rehearing that if the case is sent back for a new trial they can or will introduce such evidence, and they failed to point out or indicate the kind or character of the evidence they would offer, if any.

Furthermore, and aside from the foregoing, the burden of proof was upon the respondent in the trial court, and not upon the relators. We have held, in proceedings of this character, that the burden is upon the respondent to prove his right to the office by a preponderance of the testimony. *People v. Owers,* 29 Colo. 535, 69 Pac. 515; *People ex rel. v. Stratton,* 33 Colo. 464, 81 Pac. 245; *Lyons & Estes Park Toll Road Co. v. People ex rel. Sprague,* 29 Colo. 434, 436, 68 Pac. 275.

In *People v. Owers, supra,* Campbell, C. J., speaking for the court, said: "The burden of proof in quo war-

ranto proceedings instituted by the state is always upon the defendant, to establish his right to hold and enjoy the office constituting the subject matter in controversy; and we think it is also true that defendant must with particularity allege all necessary facts, showing not only that he was eligible to the office at the time of his election, but he must also allege and prove all essential facts, showing a continuing right to hold that office down to the time of the institution of the proceedings to oust him.  *  *  *  It must appear that defendant's alleged right to hold is clearly established by him, or he will be removed.''

In the Lyons case, supra, we held: ''In quo warranto the form of the issue as between the state and the respondent is not like that in ordinary civil proceedings. In the latter the burden rests upon the plaintiff to allege and prove his title to the thing in controversy; whereas the rule is reversed in cases of quo warranto, and the respondent, or defendant, is required to disclose his title to the alleged franchise, and if in any particular he fails to show a complete title, judgment must go against him.''

In the note to *State, ex rel. Dawson v. City of Harper,* Ann. Cas. 1917B, at page 467, stating the majority rule, it is said: ''In a majority of jurisdictions the rule still obtains that in a quo warranto proceeding or an action in the nature thereof, the burden of proof is on the respondent.''  Citing cases in support thereof from England, Canada, Alabama, Arkansas, the Colorado cases above cited, Connecticut, Delaware, Illinois and many others.

In *People v. Baldridge,* 267 Ill. 190 (108 N. E. 49) at page 195, it was said: ''In a long line of decisions this court has held that in proceedings by information in the nature of quo warranto the defendant, if he justifies, must set out his title specifically and must show on the face of the plea that he has a valid title to the office; that the people are not called upon to show anything;

that the entire onus is on the defendant, and that he must not only show by his plea, but prove, that he has a valid title to his office, and if this proof is not made the people will be entitled to judgment of ouster.   *   *   * This is also the rule in other jurisdictions. The form of the issue in quo warranto between the state and the respondent is not like that in other civil proceedings, but the defendant is called on to show title by his plea, which presents an issue of fact, and the burden of proof is upon him to establish it."

In *State, ex rel. v. Port of Tillamook*, 62 Ore. 332, (124 Pac. 637, Ann. Cas. 1914C, 483), at page 336, the court said: "In an action partaking of the nature of quo warranto, in the absence of any legislation or controlling consideration to the contrary, the rule that the onus probandi is upon the respondent applies, and the defendants must prove the existence of the corporate franchise which they are alleged to have usurped, and their title to the offices, with the wrongful claim or usurpation of which they are charged. *State, ex rel. v. Sharp,* 27 Minn. 38, 6 N. W. 408; 3 High, Ex. Legal Rem. § 629. We find that in ordinary civil actions the burden rests upon the plaintiff to allege and prove his title to the thing in controversy. In quo warranto proceedings we find the rule reversed, and it rests upon the respondent to show his title to the office or franchise in dispute. If he fails to show complete title, judgment is rendered against him."

In 4 Dillon on Municipal Corporations (5th Ed.) section 1554, the author says: "In quo warranto the court will go behind the certificate or commission, and inquire into the validity of the election or appointment, and decide the legal rights of the parties upon full investigation of the facts."

In section 1555, Mr .Dillon says: "In a proceeding by information in the nature of a quo warranto the defendant must either disclaim or justify. If he disclaims, the state is at once entitled to judgment. If he justifies, he

must set out his title specifically. It is not enough to allege generally that he was duly elected or appointed to the office. He must plead facts, showing on the face of the plea that he has a valid title to the office. The state is not bound to show anything.''

In *People v. Thacher*, 55 N. Y. 525, 14 Am. Rep. 312, quoted in *People v. Baldridge, supra,* the court said: ''The people are here the ultimate source of the right to hold a public office; and now, as heretofore, when the right of a person exercising an office is challenged in a direct proceeding by the attorney-general, the defendant must establish his title, or judgment will be rendered against him.  *  *  *  The possession of the office was not in this action evidence of his right. The burden was upon him to show by affirmative evidence that his possession was a legal and rightful one.''

In *People v. Mayworm,* 5 Mich. 146, it was said: ''The rule is well settled, that where the state calls upon an individual to show his title to an office, he must show the continued existence of every qualification necessary to the enjoyment of the office. The state is bound to make no showing, and the defendant must make out an undoubted case.''

*State, ex rel. Wallen v. Hatch,* 82 Conn. 122, 72 Atl. 575, was an action in quo warranto brought by the relator against respondent to determine the title of the respondent to the office of school committeeman, and the court said: ''In quo warranto proceedings the burden is upon the respondent to show a complete title to the office in dispute, otherwise judgment of ouster must be rendered against him.''

In *People v. Clayton* (4 Utah, 421, 436) 11 Pac. 206, at page 212, the court, quoting from High on Extraordinary Remedies, § 713, said: ''The people are not bound to show anything, and the respondent must show, on the face of his plea, that he has a valid and sufficient title; and if he fails to exhibit sufficient authority for exercising the functions of the office, the people are en-

titled to judgment of ouster. * * * he should allege such facts as, if true, invest him fully with the legal title; otherwise he is considered as a mere usurper.''

In *Lockhard v. People,* 65 Colo. 558, 178 Pac. 565, Mr. Justice Teller, rendering the opinion of the court, said: ''The rule is that the state has no burden to assume in the first instance. The complaint or information is a challenge to the defendant to show by what right he is exercising a franchise or holding office, as the case may be.''

We cited with approval in that case *People v. Canal Co.,* 23 Ohio St. 123, wherein that court said: ''The office of an information in the nature of quo warranto is not to tender an issue of fact, but simply to call upon the defendant to show its warrant or charter for exercising the privileges or franchises named.''

In the note to *State v. Harper, supra,* there is cited *Dunton v. People,* 36 Colo. 128, 87 Pac. 540, as holding that where the action is brought on the relation of a claimant to the office the burden of proof is on the relator, but that case does not so hold. This court in that case expressly states, ''It is not necessary for us to determine what the true rule is as to the burden of the proof in such cases.''

No distinction, as to this rule, can be made between a case where the district attorney institutes the proceeding upon his own information in the name of the people, and where the proceeding is instituted upon the complaint of a private party where the district attorney neglects or refuses to act. Our statute provides, among other things, that the action may be brought by the district attorney in the name of the people; that in case the district attorney shall neglect or refuse to bring the action upon the complaint of a private party, such action may be brought by such private party, upon his own relation, in the name of the people of the state; and further provides that ''in every such case judgment may be rendered upon the right of the defendant, and also upon

the right of the party so alleged to be entitled, or only upon the right of the defendant, as justice shall require.''

In the instant case it appears that the relators applied to the district attorney to institute the action upon their complaint as relators; that he refused so to do; that they then applied to the district court for permission to bring the action upon their own relation in the name of the people, which was granted, and thereupon the action proceeded upon the relation of the parties in the name of the people. The sovereign people are here represented by private relators, instead of by the district attorney, and therefore the rule with regard to the burden of proof applies to the same extent as it would apply if the action had been brought by that official.

It necessarily follows that the respondent, having offered no proof to show his title and right to the office, no judgment other than ouster could properly be rendered.

Respondent claims that we overlooked his verified answer in which he avers that mistakes and irregularities of judges and clerks had occurred in numerous precincts at that election, and that he was entitled to offer evidence in support of those allegations.

After all the ballot boxes in all the precincts had been opened, and the ballots therein had been recounted, it was found that no fraud, mistakes or irregularities had occurred in any of the precincts, save the one in question here, and both parties centered the contest on that precinct. Counsel for respondent at the oral argument before this court stated that this precinct was the only one in controversy.

In their brief, counsel for respondent state: ''Here every ballot box in the city of Denver was opened; every ballot was closely scrutinized; in many cases subjected to an actual microscopic examination; every questionable ballot was rejected; and yet the result arrived at by the election officials stood   *   *   *.   They now come into this court and concentrate their attack upon one precinct, J-6.''

Respondent therefore not only had the opportunity to introduce evidence in support of his answer, but availed himself thereof by participating in the opening of the ballot boxes in all the precincts, and recounting the ballots therein.

Having consented to the opening of all the ballot boxes and the counting of the ballots and having conceded that precinct 6, district J, is the only one in controversy here, the respondent is certainly not in a position to now ask that this case be sent back to enable him to prove the allegations of his answer as to other precincts. But if that were done, respondent could not escape the record already made by him. When the court made its findings on all disputed questions, including every ballot cast in every precinct in the city, respondent excepted only to the ruling against him on 102 ballots marked in ink below the line, and the ruling on the ballots marked in lead pencil which resulted in loss of 52, and moved for judgment. He thus, in any event, waived his right to introduce evidence on every point decided against him, save as to said 154 ballots. We reversed the judgment only as to precinct 6, J. If that goes out, and every other ballot claimed by respondent is counted for him, he failed of election by more than 250. It thus clearly appears that his right to the office depends solely upon precinct 6, J. Were he entitled to introduce further evidence, he would thus be limited to evidence touching that precinct.

Counsel for respondent at the oral argument before this court and in their brief argued the case upon the assumption that without the testimony of Unter there was no testimony which would justify excluding the vote cast in this precinct. In this we think they are mistaken. We might wholly disregard the testimony of the witness Unter and still we find that the evidence was ample to sustain relators' contention that the evidence of fraud or misconduct on the part of the judges and clerks of election in this precinct was sufficient, being uncontradicted, to exclude the vote in that precinct.

There is no merit in respondent's contention that by ordering judgment of ouster we have deprived him of his property without due process of law. There is no property in a statutory public office. The Legislature created the juvenile court, and the Legislature can abolish it. There is no contractual relation between the state and the incumbent of an office. If the office be abolished the incumbent can have no recourse to the state for the salary. In the instant case the question of salary is not involved. The only question is as to the right of the respondent to hold the office.

In 12 C. J. p. 1213, § 989, it is said: "The rule supported by the great weight of authority is that a public office is not property within the sense of the constitutional guaranties of due process of law. An officer therefore is not denied due process of law by the abolition of his office before the expiration of his term, of by his removal in the manner prescribed by statute."

We think this question is definitely settled in *Sanchez v. United States,* 216 U. S. 167, 30 Sup. Ct. 361, 54 L. Ed. 432. Mr. Justice Harlan, in delivering the opinion of the court, said: "The appellant, an inhabitant and citizen of Porto Rico, seeks to recover from the United States the value of a certain office held by him in that Island before and during the war with Spain, of which office, it is alleged, he was illegally deprived by the United States. A demurrer to the complaint was sustained and judgment given for the United States, the opinion of the Court of Claims being delivered by Chief Justice Peelle. * * * In the year 1878 the claimant, Sanchez, purchased from one Florenzio Berrios y Lopez, for a valuable consideration, the office known as 'Numbered Procurador (Solicitor) of the Courts of First Instance of the capital of Porto Rico.'"

A provisional patent was issued to him, and from that date he exercised all the rights and privileges belonging to the office, until he was deprived of it on August 31, 1899.

Justice Harlan, in concluding his opinion, said: "It is clear that claimant is not entitled to be compensated for his office by the United States because of its exercise of an authority unquestionably possessed by it as the lawful sovereign of the Island and its inhabitants. The abolition of the office was not, we think, in violation of any provision of the Constitution, nor did it infringe any right of property which the claimant could assert as against the United States. See *O'Reilly de Camara v. Brooke,* 209 U. S. 45, 49. The judgment of the Court of Claims must be affirmed."

We deem further discussion unnecessary. Rehearing denied.

*En banc.*

Mr. Justice Butler not participating.

Mr. Justice Denison dissenting in part.

I cannot concur in the order to the district court to render a judgment of ouster, but think it should be to allow respondent to introduce evidence, if he has any, as to fraud in precinct 6, J. When the respondent offered evidence the court refused to permit it on the ground that relators had not rested. Afterwards, and immediately after the motion to throw out precinct 6, J, was denied, the court asked relators whether they rested. Up to that moment, as the court had ruled, respondent had had no opportunity to introduce any evidence, other than the contents of the ballot boxes from other precincts which had been opened by stipulation before relator rested, and the court then and there of its own motion announced that no evidence in defense was needed ·and that its findings were for respondent.

If the judge had said that evidence was needed would not respondent have had the right to introduce it? We are now saying that it was needed. Has he not now, therefore, the right to introduce it?

The substance of the majority opinion on this point is that if the judge had said that evidence was needed respondent would not have had a right to introduce it, because he had allowed the motion to throw out the precinct to be heard without objecting that he had evidence which would affect that motion. That argument is not without force, but the court had announced that evidence by respondent would be improper and would not be received until relator rested. I cannot see that respondent was delinquent in relying upon and obeying the ruling of the court, yet we now penalize him for so doing.

The motion should not have been heard until relators rested, because the burden had been assumed by them and they were, in effect, moving for judgment on their own evidence only. True, the burden of proof was on respondent, but parties, lawyers and court all proceeded on the opposite theory, and the result is that respondent on this record had no opportunity to introduce any evidence to refute the evidence of fraud in precinct 6, J.

With the rest of the opinion I concur.

MR. JUSTICE WHITFORD specially concurring in majority opinion on rehearing.

I concur in the majority opinion. Keeping in mind the record alone, no other judgment than that of ouster can be ordered. The dissenting opinion on petition for rehearing has no foundation in the record before us. In that opinion the justice says that the respondent should be given an opportunity to introduce evidence as to the fraud in precinct 6, J. To say or imply that respondent did not have an opportunity to produce evidence is to ignore the whole record, as well as the character of the action and the nature of the proceeding in quo warranto. The writ commanded the respondent to come into court and show by what right he assumed to hold the office. By coming into court and assuming to justify under the writ, the burden of proof was in the first instance uncontrovertably upon him to show that he was honestly elected by a majority of the legal votes

cast. This he did not do, except to stipulate that all of the ballot boxes in the city and county might be opened and the ballots recounted. Notwithstanding the mandatory character of the writ, and the rule of law several times announced by this court casting the burden of proof upon the respondent in quo warranto proceedings, he did not call or put upon the stand a single witness in his own behalf, or state or in any way suggest to the court at any time during the course of the trial that he had any witness, either present or absent, to refute or palliate the fraud shown to exist in precinct 6, J, or in any other precinct.

So it appears that there is no foundation in fact for the statement, no doubt inadvertently made in the dissenting opinion, that when the respondent offered evidence as to fraud in precinct 6, J, the court refused to permit it. True, counsel for the respondent did say during the trial that at a future time they desired to put Francis and Lindsey on the witness stand, not for the purpose of refuting the fraud in precinct 6, J, but expressly for the purpose of exculpating Lindsey personally from any imputation of active participation in the egregious fraud found by the trial court to exist in that precinct. Clearly the opportunity was afforded respondent to give his evidence. He was summoned into court for that express purpose and no other. He was commanded by the writ and the law to affirmatively show by his evidence his right to hold the office. The opportunity was his if he desired to avail himself of it. But for reasons best known to respondent and his numerous and admittedly able counsel, the relator was permitted, without objection, to take the initiative and open all of the boxes and introduce all of the evidence introduced in the case, after which respondent, by his counsel, of his own volition, upon the evidence and record as then made, moved the court for judgment for respondent. Manifestly he was satisfied with the record and moved for judgment accordingly. Further, it may be well to say here, that

respondent cannot be permitted to try his case piecemeal. The policy of the law is otherwise. The statute expressly commands the earliest determination of an action of this character consistent with justice. Code 1921, sections 328, 329.