No. 12,130.

People ex rel. Colorado Bar Association *v.* Lindsey.

Decided December 9, 1929.

Mr. Robert E. Winbourn, Attorney General, Mr. George A. Crowder, Assistant, for the people.

Mr. Karl C. Schuyler, Mr. Philip Hornbein, Mr. Charles S. Thomas, Mr. Horace N. Hawkins, Mr. Ben B. Lindsey, pro se, for respondent.

*En Banc.*

Mr. Chief Justice Whitford delivered the opinion of the court.

The committee on grievances of the Colorado Bar Association made a report to this court of an investigation duly held by it of grave charges of misconduct of Ben B. Lindsey, a licensed attorney and counselor at law, occurring while he was the incumbent of the office of juvenile judge of the City and County of Denver.

The rules of this court provide that "The Committee on Grievance of the Colorado Bar Association shall investigate, on its own motion or upon complaint of any person, the improper conduct of any licensed attorney which affects his profession and the conduct of any other person purporting to act as an attorney." Rule 84h.

In the instant case the complaint was presented to the grievance committee by a worthy and honored member of the bar, charging the respondent with serious unprofessional conduct. At the request of the respondent, after due notice to him by the committee of the pendency of the charges, the hearing before the committee was continued for more than three months to suit the convenience of the

respondent. At the time and place designated the respondent appeared before the committee in person, and by attorney, and actively participated in the hearing before the committee on grievances, composed of nine lawyers of the highest probity, of the Colorado bar, cross-examined witnesses called to sustain the charges, and gave his own testimony, both oral and documentary, relating to the pending charges against him. At the conclusion of the testimony respondent said to the committee that he did "not care to call anybody else," and stated, "I have told the whole story." The testimony before the committee was given under the solemnity of an oath.

The hearing having been concluded, the committee prepared a report of its proceedings in the case and submitted it to this court, together with a complete transcript of the stenographer's notes of the testimony, including exhibits and all things pertaining to the hearing, for our consideration and determination. This court carefully examined the report and transcript, and after doing so reached the conclusion that the transactions and things therein disclosed relating to the activities of the respondent in court proceedings other than in his own court, and in causing action to be taken by that court in pending proceedings in behalf of a party whose cause he espoused, and in giving advice and counsel to such party with respect to proposed litigation in another jurisdiction, and in participating in conferences on behalf of those whom he represented in the settlement of legal controversies, and in accepting large sums of money for his services in connection therewith, were charges of such grave character that the report, transcript and exhibits should be referred to the Attorney General of the state for his investigation and action, as the chief law officer of this court. Thereafter an information on relation of the Colorado Bar Association was filed by the Attorney General, by leave of this court, charging respondent with grave professional misconduct as a member of the bar of this

state, and with acting as an attorney and counselor at law while holding the office of juvenile judge, and accepting money therefor, contrary to the express provisions of the statute. Thereupon the court entered its order requiring the respondent, Ben B. Lindsey, to answer the information filed by the Attorney General, and to show cause why he should not be disbarred, and his name stricken from the roll of attorneys and counselors at law. In compliance with the rule of the court to show cause the respondent filed his verified answer. Thereafter the Attorney General moved for judgment upon the pleadings. The cause is now before us on that motion. Respondent's able and distinguished counsel have filed their printed briefs, opposing the motion, and after doing so, requested the privilege of making an oral argument thereon, and also requested the court to grant the respondent's counsel additional time in which to orally present the same, all of which was granted as requested.

For a better understanding of the questions raised by the motion for judgment on the pleadings it seems desirable and necessary to state with unusual fullness the allegations as they appear in the information, and the admissions and statements made by the sworn return of the respondent. The information charges substantially as follows:

That the respondent, Ben B. Lindsey, is a member of the bar of this state, and up to July 1, 1927, held the office of judge of the juvenile court of Denver; that the respondent had been guilty of grave professional misconduct, in that he violated section 7, chapter 78, page 211, of the Session Laws of 1923, by receiving compensation besides his salary while occupying the office of judge of the juvenile court, as an attorney and counselor at law.

That the respondent, as judge, on February 3, 1920, entered an order in a proceeding pending in said juvenile court, numbered 14,279, divesting the father, W. E. D. Stokes, of the custody of his minor children, James Stokes and Helen Muriel Stokes, and appointing their mother,

Helen Elwood Stokes, guardian of said children, and vesting her with the care and custody of said minors, for all purposes, and that "they shall remain within the jurisdiction of the court, and to this end said cause shall stand continued from term to term until such other or final order as may hereafter be entered in this cause."

That W. E. D. Stokes died May 19, 1926, in the city of New York, but said order of February 3, 1920, has never been set aside, and that on the same day, May 19, 1926, respondent, as such judge, entered a further order reciting, that said W. E. D. Stokes had died, and again ordered that the said children still remain under the jurisdiction of the juvenile court of Denver and in the custody of their mother, in accord with orders theretofore entered.

That said W. E. D. Stokes left a will which was filed for probate in the surrogate's court of the city of New York on May 26, 1926, leaving his estate to W. E. D. Stokes, Jr., a son by a former marriage, entirely disinheriting his minor children, James and Helen Muriel Stokes. That the widow, Mrs. Stokes, determined to contest said will, and to that end she sought and obtained the aid, counsel and advice of respondent; and that at her request respondent, in June, 1926, proceeded to the city of New York for the purpose of procuring the services of one Samuel Untermyer, an attorney at law of said city, on behalf of the minors, for the purpose of contesting said will.

That respondent remained in New York, and participated actively in negotiations to bring about a settlement of said estate, and counseled and advised Mrs. Stokes, and actively participated in the negotiations conducted by himself and Samuel Untermyer with the attorneys for W. E. D. Stokes, Jr.

That upon his return to Denver respondent entered an order in his own court, as juvenile judge, in said cause No. 14,279, directing Mrs. Stokes to file a petition, prepared by respondent, in the county court, praying for an

order on the probate side of that court that letters of guardianship of the estate of said minors should be granted her. That respondent caused said county court to enter its order pursuant to said petition, appointing said Mrs. Stokes guardian of the estate of said minors. By said order, which was prepared by respondent, Mrs. Stokes, as guardian, was directed and empowered to employ counsel, and any other person that she might deem necessary or advisable to employ, and to make agreements for their compensation, subject to the approval of the said county court.

That, having obtained said letters of guardianship from the county court, the respondent again returned to New York with Mrs. Stokes and engaged, at her instance, in further negotiations for the settlement of the estate, with the result that in August, 1926, a compromise settlement was agreed upon, under the terms of which the assets of the estate of W. E. D. Stokes, deceased, together with certain items of property that had, during the lifetime of Stokes, been conveyed by him to his said son, were conveyed and transferred to a newly created corporation, known as the Kessto Corporation, and 14,000 shares of the total par value of $1,400,000, and being one-third of the entire capital stock thereof, were issued and delivered to said Mrs. Stokes, as guardian of said minor children.

That thereafter, on October 11, 1926, a petition was filed in said county court of Denver, in the estate of said minors, by said Mrs. Stokes, as guardian, with the advice and knowledge of the respondent, wherein it is set forth, that as a result of said compromise settlement of the estate of said W. E. D. Stokes, deceased, said minors had received 14,000 shares of stock in said Kessto Corporation, as their compromise share in the estate of their deceased father; alleged, that there was no cash available in the estate of said minors for the payment of any claims against the estate, and that such claims must be paid, if at all, by the transfer of portions of said shares

of corporate stock belonging to said minors, or by cash procured by loans upon said stock as collateral; and that the petitioner, Mrs. Stokes, is entitled in the premises to a statutory allowance, as guardian, in the sum of $43,500, represented by 435 shares of stock; that Mrs. Stokes is entitled to remuneration in addition to the amount last named for other obligations incurred by her, and for services of the utmost value by her rendered entirely apart from and beyond her duties as guardian, and in enumerating such services and obligations for which said petitioner claimed to be entitled to remuneration said petitioner further alleged, that in order to deal for the best interest of said children with her New York counsel, and for many other valuable services too numerous to be set out at length, your petitioner was compelled to employ the services of certain local parties, which services were by them rendered, and resulted in the acceleration and improvement of the character of the settlement perfected and in the saving by the reduction of fees to New York counsel, to a total saving to the estate of not less than $150,000. That Mrs. Stokes, as guardian, is under obligation to pay for such services in the sum in excess of $40,000.

That the words "certain local parties" as so used in the petition were intended to and did include respondent herein.

That said petition prayed for an order transferring from Mrs. Stokes, as such guardian, to herself as an individual, 1,135 shares of said capital stock of said Kessto Corporation, of the par value of $113,500, in payment to her of fees in the sum of $43,500, as guardian, and as remuneration to her on account of the obligations she had so incurred in behalf of said minors, and in payment of services she had performed for said estate apart from her legal duties as such guardian.

That thereafter said court entered its order in the premises, finding, among other things, that 435 shares of the capital stock of the Kessto Corporation would be

equal in amount to the statutory remuneration of the petitioner as such guardian, and that said guardian is entitled to 700 shares of the capital stock, for costs, charges, obligations and services incurred by her outside her duties as such guardian; that by said order it was adjudged, among other things, that the said Mrs. Stokes, as guardian of said minors, transfer to herself as an individual, to her own proper use and benefit, absolutely, 1,135 shares of the capital stock of the Kessto Corporation, in full settlement of all claims of hers, or remuneration as guardian, and for charges and obligations and services apart from her duties as such guardian, but owing to her from said estate.

That pursuant to said order, said Mrs. Stokes did, thereafter, transfer from herself as such guardian to herself as an individual, 1,135 shares of said stock, and thereafter, by pledging the same as collateral, borrowed the sum of $37,500, and paid said money over to respondent, Ben B. Lindsey, who thereupon received and accepted the same, and from thence hitherto has kept and retained the same for his own personal use and benefit.

That respondent was at all times fully advised of the filing of said petition last mentioned, and of the recitals therein and the contents thereof, and of the making and entering of said orders thereon, and of the subsequent transfer of said shares of stock by said guardian, from herself as guardian to herself as an individual, and of her pledging thereof as collateral, and well knew that said sum of money so turned over to him had been so derived from the estate of said minors who had been, and still were, wards of said juvenile court.

That thereafter, in December, 1926, respondent received from said Untermyer, whom he had so recommended to be retained for the services above mentioned, the further sum of $10,000, which respondent likewise accepted and kept for his own use and benefit.

The answer of the respondent to the order of this court,

to show cause why his name should not be stricken from the roll, is substantially as follows:

Respondent admits that he is a member of the bar of Colorado, and that he occupied the office of judge of the juvenile court, as alleged in the information; admits that in the juvenile court he adjudged said minors as juvenile dependents, and states that upon the death of their father they ceased to be juvenile dependents, and that thereafter the juvenile court could exercise no jurisdiction over said children; admits that said order has never been set aside; admits that he entered an order in the proceedings No. 14,279, as alleged, and states that said order was ineffective for any legal purposes whatever, but was entered by him because of the urgent request of Mrs. Stokes who was in great distress, and to allay her fears that the rights of said children in some way might be prejudiced in connection with the will of their father; admits that W. E. D. Stokes transferred his property to W. E. D. Stokes, Jr., and that the will was filed for probate in the surrogate's court, as alleged, and that the said will devised all the property to said W. E. D. Stokes, Jr., disinheriting said minors; admits that said Mrs. Stokes determined to contest the will, and that to that end Mrs. Stokes sought and obtained aid, counsel and advice of respondent; admits that at the request of said Mrs. Stokes respondent in June, 1926, went to the city of New York, for the purpose of securing the legal services of Samuel Untermyer, an attorney at law of that city, and that respondent prevailed upon said attorney to accept said employment, to contest said will, as alleged; admits that respondent undertook to bring about a compromise settlement, and that he assisted in bringing about a settlement of the controversy, in New York City, between said minors and said Stokes, Jr., and that he participated actively in negotiations to that end. Respondent states that he was instrumental in bringing about said adjustment, which was altogether acceptable and highly advantageous to said minors, in that on account of his efforts said children

will receive from the estate of their deceased father the sum of approximately $3,000,000; states that the services by him rendered were disassociated from his judicial duties as judge of the juvenile court, and that his services were, likewise, disassociated from his capacity as an attorney at law, and that he acted as a friend, mediator and arbitrator, acceptable to both sides. Respondent states that after the settlement Mrs. Stokes expressed her gratitude for his successful efforts in behalf of the minors, and offered him a sum of money in discharge of the obligation she felt toward him in connection with the settlement.

It is admitted by respondent that upon his return from New York in June, 1926, at the request of Mrs. Stokes he prepared the petition filed in June, 1926, in the county court of Denver, in the estate of said minors, No. 38,710, for letters of guardianship of said children; that he prepared the order and caused the county court 'to enter the same, pursuant to the prayer of said petition, appointing Mrs. Stokes the guardian of the estate of the said minors, by the terms of which the guardian was directed and empowered to employ counsel, and any other person that she might deem necessary or advisable, and to make agreements for their compensation, subject to the approval of the county court. Respondent admits that after the entry of said order he returned to the city of New York, at the request of Mrs. Stokes, again entered upon further negotiations for the settlement of the estate, with the result that in August, 1926, a compromise settlement was agreed upon, under the terms of which the assets of the said estate of Stokes, deceased, together with the said property conveyed to the said Stokes, Jr., during the lifetime of the father, were transferred to a newly formed corporation, known as the Kessto Corporation, and that 14,000 shares, of the par value of $1,400,000, being one-third of the capital stock, were issued and delivered to said Mrs. Stokes, as guardian of said two minor children. Respondent admits that thereafter, on October 11, 1926, a petition was filed in the county court by Mrs. Stokes, as

guardian, in the matter of the estate of said minors, and attached a copy of the same to his return, in which Mrs. Stokes, as guardian, represents to the county court that as the result of said compromise and settlement of the estate of the said W. E. D. Stokes, deceased, the minor children had received 14,000 shares of the stock of the Kessto Corporation, as their share of the estate of their father; that said guardian in said petition so presented to the county court stated, that there was no cash available with which to pay claims against the estate of the minors, and that said claims must be satisfied, if at all, by the transfer of a portion of said shares of stock, or by cash procured by loans upon said stock as collateral, and that the petitioner, as guardian, is entitled in the premises to a statutory allowance, as guardian, of $43,500. And after enumerating her services the guardian alleges, that in order to deal for the best interests of the children with the New York counsel, and for many other valuable services too numerous to be set out at length, your petitioner was compelled to employ the services of certain local parties, which services were by them rendered, and resulted in the acceleration and improvement of the character of the settlement perfected and in the saving by the reduction of fees to New York counsel, to a total saving to the estate of said infants of not less than $150,000; that your petitioner is under obligation to pay for such services to the sum in excess of $40,000.

Respondent admits that the words "certain local parties," as used in the petition, were intended to and did include respondent.

Said petition prayed the court for an order authorizing her to transfer from herself as guardian, out of the estate of the minors, to herself as an individual, 1135 shares of the Kessto Corporation, of the par value of $113,500, in payment for her fees of $43,500, as guardian, and as remuneration to her on account of obligations she had incurred in behalf of the estate of said minors. Respondent admits that on the same day the court entered its

order that the said Mrs. Stokes, as guardian, transfer to herself as an individual, to her own proper use and benefit, absolutely, 1135 shares of the capital stock of the Kessto Corporation, in full settlement of her claim as guardian, and for charges and obligations and services apart from her duties as guardian.

Admits, that pursuant to said order Mrs. Stokes transferred from herself as guardian, to herself as an individual, 1135 shares, and thereafter, pledging the same as collateral, borrowed the sum of $37,500; admits that Mrs. Stokes paid to respondent the sum of $37,500, and that the same was received by him, for his own use and benefit; admits that he received from Samuel Untermyer, an attorney at law of the city of New York, the sum of $10,000 mentioned in the information, which respondent likewise kept, for his own use and benefit.

To this return of respondent the Attorney General filed his motion for judgment on the pleadings.

Section 7, chapter 78, page 211, S. L. 1923, referred to in the information provides:

"The Judge of the Juvenile Court hereby created * * * shall receive no other compensation whatever for his services as such judge save the salary herein provided; nor shall he act as attorney or counselor at law."

However, this act was not the origin of the prohibitory clause inhibiting the judge of the juvenile court from acting as an attorney and counselor at law. It was a rule of law in full force when the juvenile court was first created. The Civil Code of 1887 provided that "A judge of a *court of record* shall not act as attorney or counsel in any court or any cause," and the act creating the juvenile court provided that it shall be a court of record.

We are now called upon to determine whether the sworn return of the respondent shows that Judge Lindsey acted as an attorney and counselor at law while occupying the position of judge of the juvenile court.

The return shows that on the day of the death of Stokes his widow, Mrs. Stokes, sought the respondent for aid,

counsel and advice; that respondent on that day, as judge, assumed to continue his jurisdiction over the minor children; that at her request respondent consented to aid and assist her in her determination to contest the will; that at her request respondent went to New York City, to secure the legal services of Untermyer in the will contest; that by his efforts respondent succeeded in securing Untermyer's services for Mrs. Stokes; that respondent participated actively in the negotiations on her behalf, to bring about a settlement of the controversy arising out of the disinheritance of her children; that under the then circumstances confronting the conferees negotiations halted, and could not progress further without legal authority in someone who could speak authoritatively on behalf of the minors in such negotiation and settlement and agreement, since Mrs. Stokes was their natural guardian only, and respondent and Untermyer represented the natural guardian, and not the legal guardian of the estate of the minor children, so that the respondent was confronted with the necessity of obtaining the appointment of a guardian with legal authority, to represent the property rights of the minors, hence, respondent returned to Denver and entered an order in his own court, as juvenile judge, ordering and directing Mrs. Stokes to file a petition, which he himself had prepared, in the county court, said court being a constitutional court with exclusive original jurisdiction of the estates of guardians, praying the county court to appoint Mrs. Stokes guardian of the estate of her minor children; that respondent conferred with the county judge on behalf of the appointment of Mrs. Stokes, and prepared the order granting her letters of guardianship, in which order it was provided that the guardian be directed and empowered to employ counsel, and any other person deemed advisable by her, and to make agreements for their compensation; that after securing Mrs. Stokes' appointment as legal guardian, and causing a provision to be made therein authorizing the guardian to make agreements for the compensation of

counsel, the respondent, with the guardian, returned to New York, where respondent renewed his negotiations for a final settlement; that after weeks of negotiations between respondent and Untermyer on the one side, and the attorneys for Stokes, Jr., on the other side, a compromise settlement was reached, and the controversy over the validity of the will was satisfactorily adjusted through the efforts of the respondent; that in his sworn return respondent states that he was instrumental in bringing about said adjustment which was highly advantageous to said children, and that it was on account of his efforts that said children did receive from said estate the large and valuable share named in said compromise settlement; that on his return to Denver respondent drew a petition for Mrs. Stokes as guardian to be filed in the county court, providing for his compensation for his services, which was to be obtained from the estate of the minors, and caused an order to be made later, with the full knowledge and approval of the county judge, so respondent states in his sworn return, authorizing the guardian to pledge the said capital stock of the Kessto Corporation belonging to the estate of the minors, as collateral for a loan of $37,500, which the guardian obtained, and paid the same to the respondent who thereafter gave her his personal receipt therefor, discharging her, individually and as guardian, from all further obligations for such services.

Respondent avers in his return to show cause and contends in his brief in opposition to the motion for judgment, that the foregoing acts were not the acts of an attorney and counselor at law, and states that the services rendered by him were disassociated from his duties as juvenile judge, and were, likewise, disassociated from his capacity as an attorney and counselor at law, and insists that he acted only as a friend, mediator and arbitrator.

From the foregoing it must be obvious to any one of intelligence why Mrs. Stokes, after the disinheritance of her children, sought the aid, counsel and advice of Judge Lindsey, instead of seeking the advice of her pastor or

physician or banker, or any non-professional friend. A will, involving millions of dollars was to be contested, and the ultimate property rights of her minor children were involved in the proposed legal contest in a surrogate's court in New York. Lindsey was a lawyer, a former probate judge of the county court for six years, and the then juvenile judge, exercising jurisdiction over her minor children. It was legal advice she sought and needed, and not the advice of a layman, or non-professional friend. In her situation she was sorely in need of the sound, militant legal advice of one experienced in the practice of the probate law and will contest litigation. Manifestly, she was in search of an attorney and counselor at law with the background of Judge Lindsey's experience in will contest cases, to advise, counsel and assist her in the impending contest with eminent lawyers of New York City on the other side. In the circumstances here disclosed we can reach no other conclusion than that Mrs. Stokes sought aid, counsel and advice of Judge Lindsey as a lawyer, because of his reputation and his large experience in probate practice and in the contest of will cases, before him as a judge of the county court. Clearly, under these circumstances, it was not Lindsey the friend, she wanted, but Lindsey the lawyer and legal adviser. And he did not disappoint her, for he willingly gave her legal advice, counsel and assistance, here and elsewhere, in the proposed will contest in New York City.

Again, Lindsey says that his services were disassociated from his capacity as an attorney at law, and that he acted for Mrs. Stokes as a mediator.

Lexicographers define *mediator* as one who interposes between parties at variance for the purpose of reconciling them. But respondent was not, as we read his return, in intermediary who interceded to put a stop to discord between Mrs. Stokes and W. E. D. Stokes, Jr., on the contrary, he was the counselor, adviser and the originator of aggressive, militant action by Mrs. Stokes against Mr. Stokes, Jr., as the sole devisee under the will, and was

counseling and advising ways and means by which millions of money and property could be taken away from Mr. Stokes, Jr., if not by negotiations, then by the institution and vigorous prosecution of a law suit in the surrogate's court in New York City. Judge Lindsey says in his return that Mrs. Stokes expressed a willingness to accept $300,000, to avoid discord, but through respondent's persistent efforts he was instrumental in securing from Mr. Stokes, Jr., a much larger sum of money for Mrs. Stokes, as guardian of the minors' estate, of about $3,000,-000, and that it was through his efforts that these results were obtained. His mediation, it would seem, was not for reconciliation but for the enforced contribution of millions of money from Mr. Stokes, Jr., by confronting him with the possible results of a vigorous prosecution of a legal contest to establish the invalidity of the will. We find no merit in the contention of the respondent to his claim of title to mediator, in lieu of that of an attorney and counselor at law, in the light of his sworn return.

The respondent makes a further attempt to distinguish the services rendered by him to Mrs. Stokes, as guardian, from those of an attorney and counselor at law, by saying that he acted as an arbitrator.

An arbitrator is an agent of both parties alike, and not of one party alone, as respondent appears to have been in the instant case. An arbitrator, in the discharge of his duties as such, is bound to exercise a high degree of impartiality, without the slightest degree of friendship or favor toward either party. It is the arbitrator's first duty to act uprightly and impartially. This it was impossible for the respondent to do with honor, for he had promised the widow to aid, help and assist her, and from all that appears she had confidently relied upon his promise, and if he thereafter assumed the attitude of impartiality, and attempted thereby to qualify himself as an impartial arbitrator it would have been a base betrayal of the confidence the widow had reposed in him from the very inception of the case. Likewise, he could not, in

honor, accept the position of arbitrator without disclosing to Mr. Stokes, Jr., that he had been the confidential adviser of Mrs. Stokes, and had solemnly promised to aid, help and assist her, as guardian of the estate of the minors in the will contest case against him, as the sole devisee. But the circumstances disclosed by the return show that there was, in fact, no agreement to arbitrate, and it is evident to any one there could be no arbitrator without an agreement to arbitrate. There was no submission by anyone of anything to arbitration. It is certain that there was no award made, for all differences were adjusted by conferences and negotiations, and finally, by a compromise settlement, if the sworn return of the respondent is true.

There is, then, no merit whatever in the contention of the respondent that he acted as a friend, mediator, and arbitrator. We are, therefore, constrained to say that such a contention is a mere subterfuge, born of dire necessity, and resorted to for the purpose of escaping the consequences of his own misconduct.

The burden, under the rule to show cause, is cast upon the respondent to justify his conduct, and since his contentions that he acted merely as a friend, mediator and arbitrator have been determined hereinbefore to be wholly without merit, it would seem that the charges in the information, being thus unexplained, must be taken as true, and that his conduct was without justification.

Viewing the case in all its aspects, as disclosed by the return and the admissions and statements in the brief of respondent, we are forced to the conclusion that the respondent was acting in no other capacity than that of an attorney and counselor at law. The practice of law in modern times is not limited to the trial and conduct of cases in court, but it has become common knowledge that the greater part of the work performed by lawyers takes place in the law offices of the members of the bar, disassociated from the court room. Outside of the court, in the law offices, and elsewhere, the attorney gives legal

counsel and advice to those who seek him for that purpose, upon every phase of human conduct and endeavor. The attorney drafts petitions, court orders, decrees, and other legal documents; he prepares legal papers in guardianship and conservatorship proceedings; he prepares legal instruments of every character, on behalf of infants and adults, by which legal rights are secured; he negotiates settlements of will contests, and other legal controversies, and drafts agreements for their final adjustment; he also organizes corporations for innumerable purposes, as, in the instant case, to take over property in dispute, and, by agreement of the parties, distributes the capital stock to the claimants, independent of court proceedings, for which he may demand, and is entitled to receive, compensation in all such cases, as an attorney and counselor at law.

It is admitted that the money given to Judge Lindsey by Mrs. Stokes and Untermyer was given to him because of what he did in bringing about an adjustment between W. E. D. Stokes, Jr., the devisee, and Mrs. Stokes, the guardian.

But Judge Lindsey says, in his return, that he received these sums of $37,500 and $10,000 as mere gifts.

Respondent presumes much on our credulity by this contention. To thus pervert the use of words cannot be permitted to lead us away from the truth. A gift, as such, is an act of generosity, and not made by the giver for the purpose of discharging an obligation. An essential element of a gift is an intention on the part of the donor to bestow something on the donee, voluntarily, and without any consideration whatever. But it seems clear to us, from the return, and from exhibits "A" and "B" attached thereto, that Mrs. Stokes paid this sum of money to Judge Lindsey in satisfaction of the services rendered by him at her request, and that respondent received the same with that understanding, and on that basis alone. For in the receipt given by Judge Lindsey to Mrs. Stokes for the $37,500, he expressly states therein that it was in

476

full payment and satisfaction of all claims against her individually, and as guardian of the estate of the minor children. Gifts are not usually receipted for, and particularly, not in the form used and adopted by Judge Lindsey and Mrs. Stokes. Mrs. Stokes, as guardian, at the instance of Judge Lindsey, petitioned the county court, in the guardianship proceedings pending in that court, for authority to take certain shares of the capital stock out of the estate of the minor children, and that the same be transferred by her, as guardian, to herself individually, with which to obtain $37,500, to be delivered to Judge Lindsey for the purpose of discharging an *obligation*, which she represented to the county court was due the respondent for services which he had rendered to the estate of the minors. In granting the order we are bound to presume that the county court acted uprightly and in good faith, and that the court gave its approval to the petition and prayer thereof on the assumption, that it was for the payment and satisfaction of a just and legal obligation, incurred by the guardian, to Judge Lindsey, for services rendered by him in their behalf.

Furthermore, gifts are exempt from the imposition of any income tax under the laws of the United States. Not so with fees and earnings of attorneys and counselors at law. Judge Lindsey says he made a return to the Government of the $37,500 received from Mrs. Stokes, and that he paid the Government an income tax thereon, which, it would seem, ought to be a conclusive answer to the contention now made by respondent that the $37,500 was a gift. Section 22, U. S. Revenue Act, 1928.

So we are irresistibly forced to the conclusion, under the facts here disclosed, that the respondent received the money, not as a gift but in payment for his services rendered to Mrs. Stokes and the minors, as an attorney and counselor at law. The conclusion is unavoidable that the respondent acted as an attorney and counselor at law while occupying the office of juvenile judge, in violation of the express provisions of the statute inhibiting him

from so acting, and in utter disregard of his oath of office.

A great jurist has said that "No man in this country is so high that he is above the law. No officer of the law may set the law in defiance with impunity, and the sole end of courts of justice is to enforce the law." Justice Bradley of the Supreme Court of the United States used this language in describing the relation of a lawyer to the law of the land: "Of all classes and professions the lawyer is the most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, to trample them under foot, and to ignore the very bands of society argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous element of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve." *Ex Parte Wall,* 107 U. S. 265, 274, 2 Sup. Ct. 569.

The respondent was a sworn officer of the public; he was also a sworn officer of this court. We do not differentiate between the character and the breach of fidelity of an attorney at law and that of a judicial officer who is out of office when the complaint is made. The untrustworthiness and infidelity in the one office shows the infidelity and untrustworthiness in the other. A violation of the judicial oath only aggravates the offence of violating the oath of an attorney and counselor at law. The administration of justice, here and elsewhere, is dependent upon the strict observance of the oath of office by every member of the bar. One of the prerequisites and indispensable qualifications for admission to the office of attorney and counselor at law in this court is, that he shall be of good moral character. This is a continuing qualification. It is a qualification necessary to entitle one to admission to the bar in the first instance, and it necessarily follows that the loss of such qualification, through misconduct, requires his suspension or removal. Unless one has the moral

strength of character to stand immovable in his fidelity to duty, against the allurements of money, and to resist temptation to do those things that are prohibited by law to the judge, then he no longer possesses that indispensable moral character which the good of society and the administration of justice demand of an attorney and counselor at law.

The respondent is a member of the bar of this court. The charges preferred against him by the Attorney General challenges his moral integrity. Just as it is the duty of this court to refuse admission to an applicant for a license, upon a showing that he lacks the necessary moral qualifications, so it is the duty of this court to remove an attorney upon a showing that he no longer possesses that indispensable moral character necessary to have his name continued upon the roll.

■ The contention that these acts and services were performed in New York, concerning matters not cognizable in the juvenile court, or in any court in Colorado, and that the respondent cannot be held accountable in this court in disbarment proceedings for such acts, rendered as an attorney and counselor at law in that city, is wholly untenable. The respondent's oath of office as an attorney and counselor at law is not only binding here in Colorado, but everywhere. He cannot put it aside or renounce it at pleasure. It abides with him at all times and places, and he will be held responsible to this court for his misconduct as an attorney so long as his name continues on the roll; nor can he put himself in a position which will place him beyond the inherent power of this court to purify the bar of its unworthy members, and to keep its roster clean.

■ The respondent, by his acts, has set the law at defiance. He was false to his oath, taken as a judicial officer, and also false to his oath as an attorney and counselor at law, and has, thereby, proven himself unworthy of the trust reposed in him by this court, and withal, wanting in that indispensable moral character which the

administration of justice demands of an attorney and counselor at law.

The judgment of this court is that the respondent be, and he is hereby, removed from the office of attorney and counselor at law, and his license revoked, and his name stricken from the roll of attorneys and counselors at law, and with costs to be taxed against him.

MR. JUSTICE ADAMS, MR. JUSTICE CAMPBELL, MR. JUSTICE MOORE, MR. JUSTICE BURKE and MR. JUSTICE ALTER concur.

MR. JUSTICE BUTLER not participating.