No. 12,130.

PEOPLE EX REL. COLORADO BAR ASSOCIATION *v.* LINDSEY.

(23 P. [2d] 118)

Decided June 5, 1933.

Mr. JAMES H. PERSHING, Mr. MORRISON SHAFROTH, Mr. PHILIP HORNBEIN, Mr. PAUL P. PROSSER, arguing in support of the petition.

Miss MARY F. LATHROP, Mr. GEORGE A. CROWDER, arguing against the petition.

*En Banc.*

MR. JUSTICE BOUCK delivered the opinion of the court.

THE petitioner, Ben B. Lindsey, a former judge of the juvenile court of the City and County of Denver, asks to be reinstated as a member of the Colorado bar. He was disbarred by a judgment of this court. *People v. Lindsey,* 86 Colo. 458, 283 Pac. 539. No petition for rehearing being filed, the disbarment became effective on December 26, 1929.

The unverified petition for reinstatement, filed here on February 14, 1933, is as follows:

"That he has at all times respected the decision which made it impossible for your petitioner to earn his livelihood in the State of Colorado, where he had spent his life since his boyhood, and accordingly he has never made any effort to practice law or to earn his living thereby in the State of Colorado since said decision.

"In the years that have followed the decision of this Honorable Court, your petitioner, by reason thereof, has been handicapped in the constructive and helpful service to society that he desires to render, and as considerable time has elapsed since the decision herein, he respectfully hopes and believes that your Honors will now find it consonant with the ends of justice to take action which will enable the petitioner to proceed in life freed from the restriction placed upon him occasioned by said decision.

"Your petitioner verily believes that your Honors should be able to find, in all the circumstances and from the long service of your petitioner in the Courts of Colorado, and to the cause of justice and humanity, sufficient merit to reinstate him on the roll of attorneys.

"He verily believes that such a ruling, restoring him to the Bar of the State that he has served and loved, would comport with substantial justice."

A formal hearing on the above petition was had in open court before all the justices. Attorneys James H. Pershing, Morrison Shafroth and Philip Hornbein, and Attorney General Paul P. Prosser argued in favor of reinstatement; former Deputy Attorney General George A. Crowder, who entered his appearance on behalf of the Colorado Bar Association, and Miss Mary F. Lathrop, who appeared for the Denver Bar Association, argued in opposition.

It was urged by counsel for the petitioner that he has been sufficiently punished and that the court in the exercise of mercy ought to readmit him to the legal practice in Colorado. Such an appeal for mercy is at all times

worthy of careful consideration. It would probably have been received with sympathy now had it not been for the conduct and attitude of the petitioner himself since his disbarment.

It is admitted that in February, 1931, the petitioner and a collaborator who was not of Colorado wrote and published a book containing most unbridled and venomous language denouncing those members of this court who took part in the disbarment proceedings of 1929. It is to the credit of the petitioner's attorneys that not one of them tried to justify or excuse this intemperate attack; some of them unhesitatingly expressed their personal disapproval of what they conceded to be outside the realm of that fair criticism of public officers which under our Constitution and laws is the undoubted right of every citizen. A copy of the book is before us.

The writer of this opinion has been a member of the court only a few months. He has personally known the petitioner for more than 35 years, and at the hearing was listening hopefully—but listened in vain—for some expression of sorrow or evidence of regret by or on behalf of the petitioner in extenuation of the unseemly tirade which had been broadcast in the land. If the writer hereof should believe for a moment these untruthful and unretracted charges against those who are now his colleagues on this bench he could not in ordinary honesty or decency remain in association with them. The majority of the court, including the writer, cannot conscientiously grant the petition so long as those charges stand without a manly apology such as one worthy of readmission to active membership in the legal profession would be willing and anxious to make. The mercy invoked for the petitioner is for those who freely confess and sincerely repudiate the wrong they have done. By his failure to meet that reasonable test the petitioner has disentitled himself to readmission at this time. Neither mercy nor justice would be lawfully served by

now restoring him as an officer of the court which he has so recklessly maligned.

The petition for reinstatement is denied.

Mr. Justice Butler and Mr. Justice Hilliard dissent.

Mr. Justice Butler, dissenting.

From the decision denying the respondent's petition for reinstatement, I respectfully dissent.

The respondent has made it difficult for a member of the court to vote for his reinstatement. After his disbarment, he published attacks upon the members of the court, assailing them in language that I do not approve. From a close official association with them, I am satisfied that in rendering the disbarment decision the justices were prompted by no improper motive, but acted in the belief that the pleadings justified such action. I labor under no embarrassment in making this statement, as I was prevented by illness from participating in the disbarment decision. But notwithstanding the difficulty suggested above, it seems to me that if the court granted the petition, it would perform an act of justice without suffering any loss of dignity or prestige, without embarrassing the administration of justice, and without endangering the interests of clients or the public.

The same authority that empowers this court to disbar an attorney gives it the power to reinstate him. *People ex rel. v. Essington,* 32 Colo. 168, 75 Pac. 394. In the Essington case we disbarred an attorney and reinstated him at the same time. We said that in that case we should exercise the power to reinstate ''rather in the nature of a pardon,'' and that, ''While we cannot exonerate him, the promptings of mercy impel us to extend to him our judicial clemency.'' We referred to the fact that Essington served in the civil war, that, except in the instance charged in the information, his conduct had been exemplary, and that several prominent lawyers testified to his good reputation. Where extenuating circumstances

have appeared, executive clemency has been extended even to murderers.

In my opinion, the respondent in the present case should be reinstated, not in the exercise of the pardoning power or as an act of clemency, but as an act of justice. The reasons for this conclusion will be stated.

The grievance committee of the Colorado Bar Association, an agency of this court for such purpose (Supreme Court rules 84a-84j), investigated the charges against the respondent, taking a mass of evidence, a transcript of which, together with its report, it lodged with the clerk of this court. But, as the court rendered judgment of disbarment upon the pleadings, it was confined within the narrow limits of the allegations therein. Neither the evidence received by the committee nor any other matter outside the pleadings could be considered; to consider them would have been unjust and highly improper. In the present proceeding, however, we are not hampered by such limitation. The question now before us is, not whether that decision is or is not correct, but whether in view of all the circumstances, the respondent, after having been excluded for over three years from the practice of his profession in this state, should be permitted to resume such practice. Everything that sheds light upon the true nature of the conduct for which the respondent was disbarred, and the degree of culpability chargeable to him, and everything that would enable us to determine whether or not the respondent's reinstatement would embarrass the administration of justice or imperil the interests of clients or the public, is a proper subject for consideration at this time. References herein to the evidence introduced at the hearing before the grievance committee, and now in the office of the clerk of this court, are not intended to cast discredit upon the disbarment decision, but to shed light upon the question now before us.

The opinion in the disbarment case *(People, ex rel. v. Lindsey,* 86 Colo. 458, 283 Pac. 539) states most of the

facts alleged in the pleadings. They will not be repeated here. This opinion should be read in connection with that one.

In the typical disbarment case the misconduct of the respondent generally results in injury to some person. In the present case no person suffered injury by reason of the respondent's conduct. On the contrary, every person connected with the transaction received a substantial benefit by reason of the respondent's activities, was highly pleased and expressed gratitude to the respondent for his efforts. Mrs. Stokes was willing and anxious to settle, for $200,000 (not $300,000), the controversy over the claims of her children to share in their father's estate. Partly by reason of the respondent's advice, she concluded not to settle for that amount, and negotiations were carried on in New York, in an attempt to obtain more favorable terms. Mrs. Stokes telegraphed the respondent, urging him to accept an appointment by the New York court as guardian of her children, but he declined to do so. He consented, however, to take part in the negotiations in New York, but only after urgent solicitation by Mrs. Stokes and after her attorney, Mr. Untermeyer, telegraphed him, saying: "Your presence would be of inestimable service. Sincerely hope you can come." As a result of the efforts of Mr. Untermeyer, aided by the respondent, the children received in settlement approximately $1,400,000. According to Victor Miller, the brother of Mrs. Stokes, that was not the first time that the respondent rendered a kindly service to Mrs. Stokes. He testified: "Judge Lindsey is a very old friend of our family; I should say of at least 25 year's' standing. * * * My sister adopted the habit, while I was still in law school, of coming to Judge Lindsey for counsel and guidance, which he gave her absolutely gratuitously." In the negotiations, the adverse interest was represented by Mr. Mitchell, of the firm of Choate, Laroque and Mitchell. After the settlement was made, Mr. Mitchell wrote the respondent, saying:

"My dear Judge Lindsey:

"Now that a settlement has been reached in the matter of the Stokes will, I wish to express my appreciation of the valuable services which you rendered in bringing that settlement to a conclusion. While you were naturally keen to protect the interests of the children to the fullest extent, your attitude was such as to enable us to handle the situation on broad lines of substance and fairness. I feel that the Stokes children owe you far more than is realized by the public." A splendid tribute!

In his deposition, taken pursuant to a dedimus, issued under order of this court, Mr. Untermeyer said:

"Mr. Mitchell and I entered upon preparatory negotiations looking to the settlement of the contest, in the course of which I had numerous interviews with Mrs. Stokes and Judge Lindsey, who was advising her as her friend and not as a lawyer. At no time did he hold any professional relation in the transaction, but he was most helpful, having known Mrs. Stokes since childhood, and being a lifelong friend of the family. I induced him to see Mr. Mitchell on a number of occasions during his stay in New York. But at no time did we discuss or refer to any questions involving his retainer or of any payment whatever being made to him in connection with what he was doing. I understood that he was throughout acting solely as a friend. * * * I do not recall his being at more than one or two of the many conferences between Mr. Mitchell and myself and when there he went at the urgent request of Mrs. Stokes, supplemented by my persuasion. He did, I think, call upon Mr. Mitchell a number of times. Mr. Mitchell liked and trusted him. * * * After the will contest had been settled and at a conference between Mrs. Stokes and myself, at which Judge Lindsey was not present, I spoke to her in terms of great appreciation of the aid Judge Lindsey had been to me in bringing about the settlement and of the great friendship he had shown for her and her children in absenting himself from his home for the purpose of helping her.

She joined in expressions of her appreciation, and I asked her whether Judge Lindsey was a man of means. She said he was not. I then told her it seemed to me that she ought to do something for him. Whereupon she said that she had intended to, and I voluntarily said that I would like to do something—out of the fee that had been arranged to be paid to me, at which she expressed herself as highly gratified. * * * I told her that I would like to send him $10,000 out of my fee, in recognition of the obligation I felt under to him for the aid he had rendered me—provided she had no objection to my doing so—which she said she certainly had not.''

Mrs. Stokes and her brother Victor, who was her attorney in the guardianship matter pending in the Denver county court, also expressed to the respondent their appreciation of his efforts in behalf of the children. Not often has it fallen to the lot of man, lawyer or layman, to receive spontaneous, unstinted praise from all parties to a controversy of that nature and magnitude. Unfortunately for the respondent, however, it has been decided that he had no right to render such service, for, in doing so, he, a judge, was acting, it is said, as an attorney and counselor at law in violation of a statute. *People, ex rel. v. Lindsey, supra.* But was the offense so heinous that the offender should be kept forever among the outcasts of the profession? Evidently the members of the grievance committee did not think so, for, after hearing and considering all the evidence, they recommended, not that the respondent be disbarred, but that he ''be publicly and severely disciplined,'' by which was meant, I take it, that he be publicly reprimanded ''by reading of an order from the bench rebuking'' him ''for unprofessional conduct,'' under Supreme Court rule 84i. Nor do some prominent members of the Colorado bar think so. The respondent's reinstatement is urged by one of our present United States senators; two of our former United States senators, one of whom has been president of the Colorado Bar Association and the Denver Bar As-

sociation; one of our present representatives in Congress; the attorney general of this state; another former Colorado Bar Association president, who at the time of the investigation was also chairman of the grievance committee, though he did not take part in the investigation; two other former presidents of the Denver Bar Association; and by other prominent members of the bar. And a former president of both Bar Associations recommends the serious consideration of the respondent's application. The attorney general appeared personally at the hearing of the application and made an earnest plea for the respondent's reinstatement. All of these lawyers make their actions conform to the high ethical standards of the profession, and are well qualified to appraise the professional conduct of other members of the bar. Immediately after the disbarment, the State Bar of California was furnished with the briefs and information concerning the facts. That body evidently does not consider the transaction sufficiently reprehensible to warrant disbarment or any disciplinary action, for the respondent has been for the past three years and over, and he is now, a member in good standing of the California bar, and has not been subjected to disciplinary action.

Before the respondent accepted the money from Mrs. Stokes, the situation was explained to the judge of the county court. Indeed, the respondent drew a petition fully explaining his connection with the transaction, but Victor Miller, considering it to be unsatisfactory in some respects, drew another petition, in which the respondent was not mentioned by name, and presented to the court that petition and also an order based thereon. The court signed the order. An inference that the respondent attempted to conceal from the court his connection with the transaction would be wholly without foundation. Victor Miller testified that when the order permitting the money to be borrowed was tendered for signature, the judge was told that "we" expected, out of the money to be raised, to make a *donation* to the respondent of

$37,500, and that the judge of the county court said: "It is too small. He won't take it. He should be paid $50,000 for the services he rendered." In his testimony, the judge of the county court said that he was not considering the propriety of the payment, but only the amount, and that he made the suggestion that if the respondent "was to be given anything at all, $50,000, in the light of Mr. Untermeyer's $175,000, * * * would be a very small sum in connection with the matter." I quote the following from the transcript:

"Mr. Vincent: Did Judge Lindsey ask you whether in your opinion it was a thing he could receive with propriety—that is, proper for him to receive? A. I rather suspect there was some conversation about that, and I told him I thought he was entitled to the fee.

"Mr. Lindsey: Judge, in our conversation a number of times, do you recall or not if I asked you if, in your judgment, it was perfectly ethical and proper, if she wanted to make that to me as a gift, it would be all right for me to acept it?

"The Witness: Yes, that was brought up a number of times in the conversations which were had.

"Mr. Lindsey: And you told me you thought it would be perfectly all right, perfectly proper, no one could make any objection to it, and people ought to be glad that she did it?

"The Witness: That is exactly what was said.

"Mr. Van Cise: But you told Judge Lindsey you thought he was entitled to that as a fee?

"The Witness: I don't know that I said it as a fee; but for the work that he had done in connection with the matter, I thought then, and think now, that he was entitled to that sum of money."

An inference that the assets of the estate of the children were depleted to pay the respondent would be unwarranted. Paragraph 9 of the petition presented to the county court and set out in the respondent's answer makes it clear that such was not the case; and in his tes-

timony, the county judge stated that it was clearly understood that the money to be paid or given to the respondent was not to come out of the estate of the minors. The uncontradicted evidence is to the effect that Mrs. Stokes executed a declaration of trust declaring that she held in trust for the children the stock she received under the court order; that the note to the bank for the money used to give to the respondent was her personal note with Victor Miller as surety; that she has been paying that note with her own money; and that at the time of the hearing before the grievance committee (June 28, 1928) the amount of the note had been reduced from $37,500 to $19,000. The stock was pledged as security so as to enable her to borrow at a lower rate of interest than she would have had to pay without the security.

An inference that the respondent recommended the employment of Mr. Untermeyer, and received the $10,000 from Mr. Untermeyer in payment for his service in doing so would be wholly unwarranted. The respondent's answer denied that such was the case, and alleged—and on motion for judgment on the pleadings the denial must be given effect and the allegations must be taken as true —that Mr. Untermeyer had been Mrs. Stokes's attorney in the litigation between Mrs. Stokes and her husband; that she had sought to employ him in the controversy over the estate; that he refused to accept the employment without a large retainer; that she thereupon requested the respondent, as a friend, to help her obtain Mr. Untermeyer's services upon terms satisfactory to her; and that as a kindness to her he did so and Mr. Untermeyer's services were secured. Mr. Untermeyer, in his deposition, and the respondent, in his testimony, substantiated these allegations.

In appraising the moral quality of the transaction, I am not unmindful of the canon of judicial ethics to the effect that a judge ''should not accept any presents or favors from litigants, or from lawyers practicing before him, or from others whose interests are likely to be sub-

mitted to him for judgment.'' American Bar Association's Canons of Judicial Ethics, Canon 32. But here the facts were these: The respondent had appointed Mrs. Stokes guardian of the persons of her minor children at a time when there was a controversy between her and her husband (who resided in New York) over their custody. The order was entered for the purpose of preventing Mr. Stokes from taking the children out of this state. The guardianship was only of the persons of the children; it had nothing whatever to do with their property or their property rights. When Mr. Stokes died, Mrs. Stokes was appointed by the county court guardian of the property and estate of the children. The purpose of her appointment by the juvenile court as guardian of the persons of her children had been accomplished, and there was no necessity for retaining such proceeding on the docket of that court. Perhaps it was because of these facts that, in deciding the disbarment case, this court proceeded on the theory that in order to justify disbarment it must appear that the respondent received the money as a fee for legal services, and not as a gift.

From the testimony of Victor Miller, Mr. Untermeyer and the respondent, which, of course, could not be considered by the court on motion for judgment on the pleadings, it appears that the money received by the respondent was a gift, not a fee. In this connection there are three matters that should be mentioned: (1) The evidence introduced before the grievance committee shows that the respondent filed an income tax return, in which was included the $37,500, and paid a tax thereon. No mention of this is made in the pleadings, and therefore it was not before the court on motion for judgment on the pleadings. In his testimony before the grievance committee, the respondent stated: ''I made a return to the Government like this: I said Mrs. Stokes, from my angle, made this to me as a gift, but she thinks and her attorney thinks that I might have some legal claim against them that I never asserted, that might be con-

sidered to have been an employment, and I will pay an income tax on it, and I did; but I said, 'I don't believe that under the law I really have to pay it.' " (2) A receipt given by the respondent to Mrs. Stokes was introduced in evidence before the grievance committee. There was no mention of the receipt in the pleadings, and therefore it was not before the court on motion for judgment on the pleadings. The receipt stated that the $37,500 was in full payment and satisfaction of all claims against Mrs. Stokes individually and as guardian of the estate of the minor children. But Victor Miller testified before the grievance committee that he believed that the respondent had a legal as well as a moral claim. The receipt seems to have been so worded out of abundance of caution on Miller's part, and not as an admission by the respondent that the money was paid as a fee. (3) The evidence shows that the check for $37,500 was made payable to the order of the respondent's wife. That circumstance was fully explained. The undisputed testimony is to the effect that out of gratitude to the respondent for his kindly and helpful service, Mrs. Stokes decided to make him a present of sufficient money to insure a modest income; that when her intention was communicated to the respondent, he requested that his wife share equally in the gift; that as he was about to leave the city on a trip and it was desired to invest the money at once, he suggested that it be given to his wife so that she could send it to her father, a banker in Detroit, for investment; that for that reason the check was made payable to her order; that she endorsed it and sent it to her father, who invested it in bonds; and that the bonds were sent to the respondent and his wife, and by them placed in their safety deposit box. Surely, from such a transaction no sinister motive can reasonably be inferred, no purpose to conceal the facts through consciousness of having done wrong.

It seems not to have occurred to any person connected with the transaction, not even to the judge of the county

court (a high-minded, able and experienced jurist) that there was anything improper in what the respondent did.

The respondent served the public for many years. Early in 1899, he was appointed public administrator. In 1900 he became judge of the county court of Denver. He was repeatedly reelected to that office, and he remained judge of that court until 1908, when he became judge of the juvenile court, which had just been created. He was reelected to that office repeatedly, and served until 1927. His extra-judicial utterances aroused antagonism, and practically during his entire career upon the juvenile court bench his conduct was scrutinized closely by those whose enmity he had incurred.

"* * * * all his faults observ'd,

Set in a note-book, learn'd, and conn'd by rote."

And yet no dishonesty or corruption was discovered, or even suggested. Nor during his long judicial career did the respondent do anything that could be called practicing law, save only on the one isolated occasion involved in the disbarment proceeding; and on that occasion, according to the evidence introduced before the grievance committee, the offense, as I view it, was largely, if not wholly, technical. The criticism of the respondent's judicial conduct was directed principally against the informal manner in which he conducted the proceedings in the juvenile court. That informality has been condemned by some and praised by many. The controversy over the respondent's views on social questions is a matter with which we have no concern in this proceeding.

Considering all the facts connected with and surrounding the transaction for which the respondent was disbarred; the respondent's long and distinguished service on the bench; his outstanding contribution to the art of dealing judicially with the problems of delinquent and neglected children; the fact that he is a member in good standing of the bar of a sister state; the recommendations of prominent members of the Colorado bar; and the fact that no other charge of professional misconduct has

been made against him—I am forced to the conclusion that justice demands the reinstatement of the respondent as a member of the Colorado bar.

Mr. Justice Hilliard, dissenting.

I am largely in accord with the opinion of my Brother Butler. I was not a member of the court at the time the respondent was disbarred and feel somewhat embarrassed in expressing my conclusions. It seems to me, from the record in the former proceeding, that the respondent should have been discharged. His offense, if it was an offense, was devoid of moral turpitude. It has never, I am sure, been seriously charged against him that he was lacking in any moral characteristic or seriously contended that he was guilty of more than what might, and might not, be thought to be a technical infringement of a statute. If it be true that in accepting the amounts he received he was practicing law, it should be borne in mind that not all judicial officers are forbidden to practice law. County judges in counties of the third, fourth and fifth class may do so. C. L. '21, §6014. It should also be remembered that the juvenile court is of inferior jurisdiction and that but recently we have been obliged to prevent its usurpation of jurisdiction vested in the district court. *Abbott v. People,* 91 Colo. 510, 16 P. (2d) 435. Indeed, it might be said that a large part of the importance which attaches to the juvenile court is due not to its powers, but to the manner in which the respondent and his successors have conducted it.

The juvenile court exists only in the City and County of Denver. In the other counties its powers and duties are vested in the county courts. C. L. '21, §655. It is inferior, because of its lack of jurisdiction of ordinary civil causes, to the county court. However, in the absence or disability of the juvenile judge, any county judge may be called upon to preside. C. L. '21, §5827; Chapter 111, Laws 1931, page 436. Hence the juvenile

judge must be held to be of equal rank with county judges.

Consider what has been pointed out in the foregoing paragraph and from that premise reexamine the charge upon which the respondent was disbarred. Assume, and it is not difficult, that every step in the Stokes proceedings had been passed upon by a county judge from a county of the third, fourth or fifth class sitting in his own court or for the respondent. Recall, in this connection, as can all lawyers who practiced in the City and County of Denver during the time respondent was juvenile judge, that a county judge from a county of one of these classes sat for the respondent repeatedly. The same judge later was held to have defeated the respondent for juvenile judge. *People ex rel. Graham v. Lindsey,* 80 Colo. 465, 253 Pac. 465. Considering, assuming and recalling these things, we arrive at a very remarkable destination, for if Judge Graham, for example, had been sitting for Judge Lindsey and had done each and every thing the latter is said to have done, not a word of criticism could have been justly uttered against him and he would not even have been subject to the fine of not less than $20 or more than $100 that the legislature believes is sufficient punishment for even a district judge who practices law. C. L. '21, §6015. No, it is very plain to me that the respondent was not guilty of any reprehensible act, and that to visit disbarment upon him was unmerited. Is it not unthinkable that two judges of equal rank may perform the same acts and one be branded as immoral and unfit while the other would be considered to have acted and would be within his rights?

It has been charged against the respondent that after his disbarment he indulged in severe criticism of the court for its action. I do not think we should deal harshly with him because of that, or consider it at all. If my view of the record is sound, perhaps he was entitled to make some comments upon the situation; he was vitally affected. I should say it was a matter of taste and be-

cause another person similarly situated might say nothing we should not punish respondent because his taste was otherwise. The State Bar of California was not of opinion that his acts warranted disbarment or discipline. I cannot blame Judge Lindsey for agreeing with that body and not with this court.

In the oral argument on the application for reinstatement it was brought to our attention that the respondent had been particularly caustic in his references to the writer of the opinion in which his disbarment was ordered. It was said that the respondent laid the defeat of that judge to the fact he had written the opinion. I do not venture to pass upon the soundness of that conclusion; it may be correct, although I have often entertained the thought that at least one and perhaps many other factors contributed. But the point is not whether my election was due to what was said of the respondent by the writer of the court's opinion. The point is that I should not be offended because the respondent chooses to entertain that belief and that the court should not be offended because a defeated litigant expressed his view of the judgment in forceful language. After all, the respondent was not a member of the bar of this court when he made the statements complained of. And if he had been and were, I feel that the dignity and prestige of the court and the confidence of the people in the integrity of its members is not shaken because one who has suffered our displeasure humanly expresses himself to be of a contrary mind to those who have judged him. Courts should be larger than that. We have graver duties than defending ourselves.

Hence, I wonder why it should be thought necessary that the respondent should sue with an humble and contrite heart. He would be less a man were he to do it. The quality of mercy should not be strained, and I for one would rather grant the boon to the proud man, who holds his head aloft, who has boldly stated his convictions, confident in his own soul that he has done no

wrong, than to bestow it upon the whining and fawning creature who might cower before us with lying words in his teeth. As I have said, perhaps the State Bar of California and the respondent are right. Galileo solemnly recanted and pronounced the world to be flat. Must the respondent suffer because he persists in believing it to be round?

The career of the respondent has been most remarkable. No other citizen of this state has attained his fame, or, as some would have it, notoriety. It depends upon one's notions of sociological problems, certainly too speculative a realm to comment upon except in theory until the passage of many years demonstrates the truth or falsity of a given problem. The respondent may be right in all or part or none of his postulates. I may be wrong in all or part or none of mine. But we are not trying him upon our agreement or lack of agreement with him. The question should be, If he is restored to the right to practice law, is there danger that he will sully the profession and betray any person by dishonorable or immoral acts? I can perceive but one answer, the negative.

We have refused to disbar and have reinstated men who betrayed their clients. We have refused to disbar and have reinstated men who stole their clients' funds. We have refused to disbar and have reinstated men who bore the felon's brand. We have shown mercy to men whose acts were dishonorable and reprehensible. We have shown mercy to men whose acts made black the escutcheon of the bar. Should we refuse to reinstate a man who never betrayed anyone? Should we refuse to reinstate a man who never stole a penny? Should we refuse to reinstate a man of whom it has never been said that he committed a crime? Shall we say to this man, whose every act, I say, has been prompted by a desire to do right, You shall not be reinstated? Shall we say to this man, who has all his life striven to make the profession of the law an honorable one, You shall not be reinstated? I submit not.