# IN RE CONTEST OF ELECTION ON NOVEMBER 2, 1954, OF CLARENCE VETSCH AS SHERIFF OF COUNTY OF HOUSTON, MINNESOTA.
## BERYL KERRIGAN v. CLARENCE VETSCH.[1]

July 8, 1955.

No. 36,619.

---

[1]Reported in 71 N. W. (2d) 652.

*Richard H. Plunkett, Plunkett & Plunkett,* and *Milton A. Kludt,* for appellant.

*C. Stanley McMahon, George, Brehmer & McMahon,* and *Thomas A. Flynn,* for respondent.

CHRISTIANSON, JUSTICE.

This is an election contest for the office of sheriff of Houston county. Clarence Vetsch and Beryl Kerrigan were the only candidates for the office of sheriff at the general election held in Houston county on November 2, 1954. The initial results as determined by the county canvassing board gave the contestee Vetsch a total of 3,371 votes while the contestant Kerrigan received only 3,294 votes—a difference of 77 votes. The report of the inspectors of the ballot, who were appointed by the trial court to recount the ballots, found that a total of 3,252 qualified votes were cast for the contestee Vetsch and 3,114 qualified votes were cast for contestant Kerrigan, thus giving Vetsch an increased, total plurality of 138 votes if the ballots cast for sheriff in the precinct of La Crescent village in Houston county are to be counted.

Kerrigan, in his notice of contest, alleged many serious violations of the Minnesota election laws in the precinct of La Crescent village and claimed that all the ballots cast in that precinct were invalid, thus giving him a plurality of the remaining votes cast in the election for sheriff in the county. The inspectors of the ballot found that Vetsch had received 465 votes to 169 votes for Kerrigan in the La Crescent village precinct. The trial court ruled that the total vote cast at La Crescent village was invalid and as a result held that the contestant Kerrigan was entitled to the certificate of election. The contestee Vetsch appeals from the order denying his alternative motion for amended findings of fact and conclusions of law or for a new trial.

The contest of this election thus becomes focused upon the circumstances surrounding the voting at La Crescent village. About a month before the election in question, and after a regularly sched-

uled village council meeting had adjourned, the mayor of La Crescent village discussed the question of an election board for the approaching general election with another member of the council and with the village clerk, William Lathrop, who was also a member of the council. At that time the mayor made several suggestions as to whom the clerk might get to serve as members of the election board and then more or less left the matter to the clerk. The village council took no formal action in regard to the selection of the board, and it does not appear that the other members of the council had any knowledge of the method of selecting the election board members. In choosing the five members of the election board, Lathrop made no distinction between those who were to act as election judges and those who were to act as election clerks. In fact, no differentiation was made between the two classifications and their respective functions throughout the entire preliminary election procedures or after the polls were closed.

On a Saturday the week before election, the Houston county auditor's office prepared a package of 900 county ballots for La Crescent village, and they were picked up and delivered to the La Crescent village clerk, Lathrop, the Wednesday before the election. In spite of a duty to hold the ballots and turn them over to the election judges on the day of the election, Lathrop passed out three of the ballots to three persons who had not made proper application to the county auditor but who requested ballots from him so as to enable them to vote as absentees. In so doing, Lathrop had the three persons fill out blank applications left over from a special village election in regard to a municipal water well held earlier in the year. Lathrop initialed the three ballots as a judge of the election, although he was not serving in that capacity. In addition, he posted two of the ballots on bulletin boards and marked them "sample" the day of the election because he thought it "appropriate" to do so. At no time did the village clerk, who prepared the ballot receipt, count the number of the canary yellow ballots, *i.e.*, the county ballots, nor did the three persons signing the receipt for 900 ballots as judges of the election count the number of ballots.

Although the election register indicated that Lathrop had administered the oath of election judge to Delia Oldenburg, Rose Heyerdahl, and Josephine Fancher, and the oath of election clerk to George V. Kelly and Alvilda Anderson, the oaths to all but Kelly were actually administered by Kelly and not Lathrop. Although Kelly was considered, at least by Lathrop, to be more or less in charge of the election, Kelly was unaware of the laws governing the election and made no effort to become acquainted with them.

Kelly had himself been sheriff for eight years until 1946 when he lost his race for re-election to Kerrigan, the contestant in this action. Kelly ran against Kerrigan again in 1950, but failed to win in that year also. The record indicates that the contestee Vetsch was a friend of Kelly and that Kelly told his friends that he would like to see Vetsch get the office.

Once the polls had closed Kelly took over the counting of the county ballots by reading off the ballots to others who tallied the results. He read off the county ballots for some 12 to 13 hours with intermittent rest and lunch periods, although Mrs. Rose Heyerdahl, one of the judges listed in the register, and Lathrop, who was not a member of the election board, took over for him on brief occasions. In addition to the original five members selected to the board and also Lathrop, who did not attempt to qualify as a judge or clerk,[2] there were at least three other unauthorized persons, apparently taking no oath, who participated in the counting of the ballots. The three consisted of Mrs. Lathrop, wife of the village clerk; Myron Anderson, son of Mrs. Alvilda Anderson, one of the two people listed in the register as a clerk; and Francis Fancher, husband of Mrs. Josephine Fancher, one of those listed as a judge. Thus all three replacements had a relationship of husband-wife or parent and child to the original people acting as judges and clerks in apparent violation of the statute prohibiting such relationship.

---

[2]It should be noted, however, that M. S. A. 205.47 provides:

"* * * in villages having but one district and not included in any town, the village clerk, shall serve as one of the clerks in the district where he resides."

While the votes were being tabulated after the polls had closed in the various precincts in Houston county, Mrs. Ruth Corcoran, the county auditor, placed a large blackboard in the county courtroom at Caledonia on which the results of the races were posted as soon as they came in. A large crowd gathered in the courtroom throughout the night of the election to observe the results. It was the practice for the various precincts to call in their results as soon as they were tabulated and these unofficial returns were compiled on the blackboard. The individual precincts then delivered the ballots, registers, and other election materials to the county auditor. At this time the official return, as taken from the official summary sheet, was compared with the unofficial returns on the blackboard and the blackboard entry was corrected if necessary. Although the record is not specific on the point, it appears that the unofficial returns or phone calls were in from all the precincts except La Crescent village by 3 a. m., and the results posted. Although the county auditor's office made several calls to the La Crescent village precinct in an effort to get at least the unofficial tally, the workers there had not completed their counting.

While the people at La Crescent village were counting the ballots, there were other persons coming in and going out of the same room, including contestee's brother, Harold Vetsch, who was the custodian of the building in which the election was held. At about 4 a. m., the contestee Clarence Vetsch himself came in with some other people to see how the voting was going. They informed Kelly what the results of the election for sheriff were in the rest of the county. At that hour all the results were posted on the blackboard at Caledonia except that of La Crescent village. The La Crescent tally was called in to the auditor's office about 9 a. m. that morning, and the election materials brought into Caledonia by Kelly at approximately noon of that same day.

The inspectors of the ballot found that the wax seal on the large Manila envelope containing the tally books and returns had been broken and resealed. Lathrop explained that this had occurred

because he had mistakenly put the summary sheet of election results in that envelope rather than in the envelope provided for that purpose and that he had made the change when someone noticed the error. The inspectors also found that no entry was made in the election register to show which voters had voted, as required by law. Although there were only 653 persons registered, there were 654 votes cast in the precinct, and in spite of the fact that the judges' statement of ballots received, voted, unused, spoiled, and returned indicated that 247 ballots were unused and returned, the inspectors found only 194, plus 2 that had been used to tally the votes, or a total of 196. The status of the La Crescent village ballot may be recapitulated as follows:

| | | |
|---|---|---|
| Sent out by Auditor's Office | | 900 |
| Absentee ballots sent out by Auditor | | 11 |
| Ballots voted (including 3 handed out by Lathrop as absentees) | 654 | |
| Posted by Lathrop before the election | 2 | |
| Ballots returned unused | 194 | |
| Returned spoiled—used to tally | 2 | |
| Totals | 852 | 911 |
| *Unaccounted for:* | 59 | |
| | | 911 |

In addition to the shortage of 59 ballots found in the La Crescent village precinct, the inspectors also found shortages and overages in several other precincts, but the other shortages never exceeded 29 ballots, with the average shortage equaling only 14 ballots in the six precincts which were found to be short on their returned, unused ballots.

Of the 654 ballots voted in La Crescent village, the votes for each candidate were as follows:

Vetsch ........................................... 465

Kerrigan ......................................... 169

    No vote as to sheriff ........................... 6

    Ballots without initials ........................ 11

    Initials of only one judge ..................... 3

                                       20

                               TOTAL    654

The trial court in throwing out the La Crescent village ballots found 3,124 votes resulting to Kerrigan as opposed to 2,900 votes for Vetsch thus giving Kerrigan the election by 224 votes. In determining the final totals for each candidate, however, the trial court, because it found no evidence of fraud or mistake in the other precincts, allowed 179 votes for Kerrigan and 113 votes for Vetsch which the inspectors had not counted because the ballots did not bear the required judges' initials. Thus had the court not thrown out the La Crescent vote, Vetsch would have had a plurality of 72 votes as opposed to a 138 vote margin determined by the inspectors and the 77 vote advantage shown by the original count.

   ■   Because elections if they are to be valid must be held under authority of law and substantially as required by the statutes providing therefor, an election conducted by persons who are unauthorized to act as election officers is not a valid election even though those persons conduct the election in an honest fashion.[3] There is little doubt but that the election held in La Crescent village on November 2, 1954, was not conducted by a *de jure* election board. An officer *de jure* is one who in all respects is legally appointed and qualified to hold a particular office.[4] In order for an election board to be a *de jure* board it must have been appointed in accordance with the statutes providing therefor.

---

[3]See, 18 Am. Jur., Elections, § 38.

[4]43 Am. Jur., Public Officers, § 472; 67 C. J. S., Officers, § 4.

M. S. A. 205.46 insofar as here pertinent provides:

"* * * In villages having but one district, and not included in any town, the members of the council shall be judges, *subject to the qualifications and restrictions provided for members of town boards in like cases.*" (Italics supplied.)

The applicable "qualifications and restrictions" as to town boards is found in § 205.45, which provides in part:

"* * * No member of such [town] board [*i.e.*, village council] shall be compelled to serve as judge, and if any decline they shall notify the town board [village council] in time to fill the place by appointment. When for any reason it becomes necessary to appoint one or more judges in order to provide three judges for each district, such town board [village council] shall appoint the number required from resident qualified voters therein, and cause posted notice thereof to be given in each district at least ten days before the election."

The members of the village council did not serve as judges nor did the council appoint the judges through any official council action. The appointment of judges was contemplated in a haphazard fashion after an official meeting of the council had adjourned. At the time there were only three of the five councilmen present, and the actual appointment was turned over to the clerk without any apparent knowledge by the councilmen as to who actually was appointed by him. Nor was any notice posted ten days before the election as required by the statute.

Under § 205.47 the clerks of the election are to be appointed by the judges, but here Lathrop, and not the judges, selected the clerks at the same time he chose the judges and did so without making any distinction between the two classifications.

With regard to the status of the election board after the polls had closed, § 206.40 provides that "During such canvass [initial counting of the votes] no person other than the judges and clerks shall handle or interfere with the ballots." In the La Crescent village election, four unauthorized persons, consisting of Lathrop, Francis

Fancher, Myron Anderson, and Mrs. Lathrop, took part in the calling and tallying of the votes. No one of the four took the oath as required by § 205.54, nor was § 205.53 complied with which provides:

"When any clerk, after entering upon the discharge of his duties, becomes unable, or for any reason fails, to complete the performance of his duties, the judges may appoint another in his place, who shall take the required oath. The fact of his appointment, the time when and circumstances under which it was made, shall be noted in the election registers, if the polls have not been closed, and, if closed, all of the same shall be certified with the returns; and such statement shall show the work done and to be done at the time of such appointment."

In addition, since Mrs. Lathrop was the wife of William Lathrop, Francis Fancher was the husband of Josephine Fancher, and Myron Anderson was the son of Alvilda Anderson, they apparently were ineligible to become clerks or judges because § 205.47 provides:

"* * * No two judges or clerks in any one district shall bear the relationship to each other of husband and wife, parent or child, brother or sister."

There thus was a complete failure to comply with the statutory provisions in regard to appointment of the election board, and the persons who administered the election cannot be held to constitute a *de jure* board.

Although a *de jure* board may be lacking, an election will not be held void if there be a *de facto* board. In determining if a *de facto* board exists the law will distinguish between mere intruders and those who conduct an election under color of authority.[5] Thus it is generally held that an election will seldom be vitiated merely because of some deficiency in the manner of appointment of an election board official.[6] It would thus appear that the *original* five persons selected by Lathrop were sufficiently held out to the public during the course of the voting so as to qualify as a *de facto* board.

[5] 18 Am. Jur., Elections, § 38.
[6] See, Annotation, 1 A. L. R. 1535, 1536.

The significant factor is that the persons having occasion to deal with the board must recognize them as the official body assigned to handle the affairs of the election.[7]

But the question of whether a *de facto* board existed after the polls had closed is complicated by the fact that four unqualified and unauthorized persons took over and exchanged duties with the original five judges and clerks. Whether, after the polls have closed, there may be a sufficient holding out to the public by those disqualified by statute and by those failing to take the required oaths we do not here decide. It is sufficient for the purpose of this appeal that we assume, without deciding, that a *de facto* board did exist.

■ It has long been the policy of this state that "in the absence of fraud or bad faith or constitutional violation, an election which has resulted in a fair and free expression of the will of the legal voters upon the merits will not be invalidated because of a departure from the statutory regulations governing the conduct of the election except in those cases where the legislature has clearly and unequivocally expressed an intent that a specific statutory provision is an essential jurisdictional prerequisite and that a departure therefrom shall have the drastic consequence of invalidity."[8] This policy rests upon the sound principle that no person should be deprived of his right to vote because of the neglect or carelessness of election officials, unless the carelessness or irresponsibility has been carried to such an extent as to affect the true outcome of the election or put the results in doubt. In pursuit of this policy it has been generally held that after an election is over, statutory regulations are usually construed to be directory rather than mandatory[9] unless the departure from the statutes casts uncertainty upon the result.[10]

[7]See, Harvey v. Sullivan, 406 Ill. 472, 478, 94 N. E. (2d) 424, 428; Gilleland v. Schuyler, 9 Kan. 569, 587.

[8]See, In re Order of Sammons, Co. Supt. of Schools, 242 Minn. 345, 350, 65 N. W. (2d) 198, 202.

[9] In re Order of Sammons, Co. Supt. of Schools, 242 Minn. 345, 350, 65 N. W. (2d) 198, 202; State ex rel. Maffett v. Turnbull, 212 Minn. 382, 385, 3 N. W. (2d) 674, 676.

[10]18 Am. Jur., Elections, §§ 206, 224.

Although admittedly no fraud has been shown in the present contest, there is no necessity of proving actual fraud in all cases.[11] It is sufficient if there has been such a wholesale violation of the election laws, even be they only directory, that so great an opportunity for fraud exists as to impeach the integrity of the ballot. Thus the California supreme court in dealing with a similar problem said in Tebbe v. Smith, 108 Cal. 101, 111, 41 P. 454, 457, 29 L. R. A. 673:

"* * * But the rule as to directory provisions applies only to minor and unsubstantial departures therefrom. There may be such radical omissions and failures to comply with the essential terms of a directory provision as will lead to the conclusive presumption that the injury must have followed. A substantial compliance with the terms of directory provisions is, after all, required. And such a substantial compliance is not had by strictly following some provisions, while essentially failing to observe others. There must be a reasonable observance of all the prescribed conditions.

"It is the duty of the courts so far to adhere to the substantial requirements of the law in regard to elections as to preserve them from abuses subversive of the rights of the electors."

In our opinion there has been such a substantial failure to comply with the law in the instant case. The election laws were violated from the very start of the election in La Crescent village. And in addition the violations were numerous, viz., improper appointment of the election board; improper handling of ballots by the village clerk; unauthorized issuance of absentee ballots; failure to take, administer, and indicate proper oaths; unauthorized and ineligible persons filling in as judges and clerks without indication thereof; the intermixing of clerk and judge functions; failure to count ballots before issuing receipts therefor; and inadequate maintenance of the election register. The people conducting the election appeared to be completely unaware of the laws governing elections, and what is more, they made no effort whatsoever to become acquainted with them.

---

[11]People v. Lindsey, 80 Colo. 465, 481, 253 P. 465, 470.

What is more serious than the numerous violations already referred to, however, is the evidence that the inspectors found one more ballot voted than the number of persons listed in the election register and that there were 59 ballots missing from the La Crescent village precinct. The record shows that the results in the race for sheriff in the rest of the county were known to the workers at La Crescent village by 4 a. m. on the night of the election before they had completed their own tally. At that stage the blackboard in the courtroom at Caledonia would have shown Kerrigan leading by approximately 220 votes. According to the inspectors of the ballot, the La Crescent village tally sheets show that 650 votes were cast for sheriff in that precinct with 475 being for Vetsch and 175 being for Kerrigan thereby giving Vetsch a 300-vote plurality in La Crescent village and about an 80-vote margin in the county as a whole. Thus the contestant argues that, because a switch of 41 votes would have been all that was needed to change the total county vote, it would have been a simple matter for someone to have marked a sufficient number of the 59 blank ballots with the desired results and to have disposed of the original ballots cast. Contestant also points to the fact that George Kelly, the manager of the election, was an old political rival of Kerrigan and a friend of Vetsch, and also that La Crescent village did not get their unofficial returns in until 9 a. m. the next morning while the other precincts with a similar number of ballots to count had their unofficial and official returns in much earlier.

Whether the events intimated by contestant actually occurred, we, of course, have no way of knowing and indicate no opinion thereon one way or another. The important and crucial point is, however, that a cloud of suspicion has been cast upon the integrity of the voting in the La Crescent village precinct. The foundation upon which an election system rests is the confidence which the electorate places in that system. The voter is entitled to have his vote counted fairly and honestly along with the votes of others. If his confidence in this procedure is undermined, there will necessarily be a loss of respect for the democratic system which is wholly dependent upon fair and honest election procedures.

To hold that the court's hands are tied unless there is an actual showing of fraud is to say that the election laws are of no effect and need not be followed. We realize full well that the disenfranchisement of a voter is a serious matter, but there is also an obligation to see that the will of the voters in other precincts whose ballots have, without a doubt, been honestly cast and counted is vindicated. A decision of this nature does not rest upon a single incident occurring during the election but upon the cumulative effect of the numerous serious violations which occurred. The purpose of the election laws is to assure honest elections. Such a wholesale flouting of the law cannot be tolerated when the result is to cast doubt and suspicion upon the election and impeach the integrity of the vote.

The order appealed from should be affirmed.

Affirmed.